[Crim. No. 3777. In Bank.—April 19, 1935.]

THE PEOPLE, Respondent, v. WILLIAM E. TANNER et al., Appellants.

Griffith Jones, Edward Feldman, Ralph Eckhardt, Harold L. Davis and John Groene for Appellants.

U. S. Webb, Attorney-General, Frank Richards, Deputy Attorney-General, Buron Fitts, District Attorney, and Tracy Chatfield Becker, Deputy District Attorney, for Respondent.

SEAWELL, J.—The appellants, William E. Tanner, Harry C. Brooks (Kiewiet) and James J. Hill, who entered a plea of guilty, as will hereafter appear, were tried and convicted in the Superior Court of the County of Los Angeles upon an indictment returned against them by the grand jury accusing them of the crimes of kidnaping and robbery by means of deadly weapons.

The defendants were jointly charged and jointly tried, with the exception of Hill, who, on the second day of the trial, was permitted to withdraw his pleas of not guilty to the counts charging robbery (2 and 4) and enter pleas of guilty to said two counts of the indictment. The two counts charging kidnaping (1 and 3) as to Hill were subsequently dismissed, and he was called as a witness by the prosecution and gave testimony on behalf of the People implicating his two confederates in the commission of the offenses of which they were found guilty. Judgment was pronounced upon Hill on his pleas of guilty as provided by law.

Counts 1 and 3 accused said defendants and appellants with the crime of seizing, confining, abducting, kidnaping and carrying away the persons of Henry G. Bodkin and Ruth Bodkin, his wife, respectively, with the intent and for the purpose of committing robbery, as said crime is described by section 209 of the Penal Code as it now reads, after having passed through the amendatory processes of several legislatures—a subject which will receive consideration hereafter. Counts 2 and 4, respectively, accused said defendants and appellants with the separate crimes of robbing said Henry G. Bodkin and his wife, Ruth W. Bodkin, said

defendants being armed with deadly weapons in the perpetration of said respective crimes of robbery. Defendant Tanner was charged with a prior conviction of a felony committed in Texas, in 1926, to which he entered a plea of having suffered said prior conviction.

Both Brooks and Tanner were found guilty of the offenses charged in the four counts. The jury returned separate verdicts against each of the defendants of guilty of kidnaping for the purpose of robbery, as charged in counts 1 and 3, and the court pronounced a judgment which carried with it the death penalty in compliance with said verdicts. The jury also found each defendant guilty as charged in said counts of robbery, and the court pronounced its judgment as provided by law, with sentences of imprisonment as to each defendant running consecutively. During the trial Tanner was granted leave to interpose a plea of not guilty by reason of insanity. This issue was submitted to the same jury which tried him on the offenses alleged in the indictment, and it found against him on the issue of insanity.

Defendant Brooks has appealed from the orders refusing to grant his motion for a new trial and from the several judgments of conviction. Defendant Tanner has appealed from the judgments of conviction; from the order refusing to dismiss counts 1 and 3; from the order denying his motion in arrest of judgment, and from the order denying his motion for a new trial.

Mr. Henry G. Bodkin, a well-known lawyer of the city of Los Angeles, was residing with his family at the family residence, No. 2015 North Berendo Street, on December 16, 1933. His family consisted of himself, his wife, Ruth W. Bodkin, and his twelve year old son, Grattan. Mrs. Amelia Smart was also a member of the household, serving in the capacity of housemaid. Mr. and Mrs. Bodkin had prepared themselves to attend a Christmas entertainment given by the Bar Association of Los Angeles County. At about 6 o'clock in the evening Mr. Bodkin left the residence to go to his garage and put his automobile in readiness for the drive to the place of entertainment. His garage contained two machines and was situate about seventy-five feet from the residence. Shortly after entering the garage he turned on the automobile lights and backed the automobile down the driveway a short distance, when a stranger, whom he identi-

fied at the trial as Tanner, approached him and inquired if he was Mr. Bodkin. Upon being assured that he was, Tanner, who at this stage was unmasked, said: "We have a Christmas present for you." Tanner carried a book which resembled a book of blank receipts, and told Mr. Bodkin that he should sign for the present. At this moment Mr. Bodkin looked about and saw the second man, whom he identified as Hill, approaching carrying a large pasteboard box or carton. Mr. Bodkin instructed him to put the package in the rear of the car. At this juncture Hill, being partially masked by a handkerchief tied across the lower part of his face and holding a gun in his hand, said: "This is a stick-up. We mean business. We want your money." Mr. Bodkin took his wallet out of his pocket and said, "Here it is." Hill said, "We want real money. We are going inside." He ordered Mr. Bodkin to cut off the motor and get out of his car. Tanner, who was unmasked when he first approached Mr. Bodkin under the guise of a messenger delivering a Christmas present to him, immediately slipped up a handkerchief which was tied about his neck and so adjusted as to serve as a mask. He also held a pistol in his hand.

Mr. Bodkin was ordered to put his hands up, which he did, and led the way into his residence. The two men walked behind him with guns touching his back, and followed him into the house. They repeatedly said to him, "Not a squawk out of you, or we will plug you. We are going inside." The distance to his rear door was about fifty feet. On the way to the house Mr. Bodkin informed them that the maid was in the kitchen and she might become excited and give an alarm. One of the men said, "It is up to you to keep her quiet. If she hollers we will plug you. Keep her quiet." Mr. Bodkin rang the rear door bell and as the maid came to the door he cautioned her not to get excited and asked her to let them in. She opened the door and Mr. Bodkin and the defendants entered. The defendants had guns in their hands, but Mr. Bodkin told the maid they were friends of his and to go forward and not to get excited. Mr. Bodkin and the maid were marched to the dining room and Mrs. Bodkin was observed walking in the hallway toward the dining room. Mr. Bodkin said to her, "Ruth, do not get excited; do not holler. These men are armed and they will shoot." He inquired as to where

Grattan, the twelve year old son, was, and Mrs. Bodkin said that he was in the bathroom. Mr. Bodkin requested that he be permitted to remain where he was, but Hill refused the request. Tanner followed Mrs. Bodkin into the bathroom and the boy was brought into the dining room, where he joined the group of captives.

The dining room was fully lighted, but the shades were carefully drawn and pulled together by Hill and Tanner to shut out the view of persons on the outside. They compelled Mrs. Bodkin to turn off the front porch electric light. Mr. Bodkin was searched for arms, and required to take off his overcoat, undercoat and vest. Mr. Bodkin's wallet containing $19 was placed on the dining room table. All present were commanded to sit down. Each one faced the table. Hill said, "We want your money." Mr. Bodkin assured them that all the money he had on the premises was the $19 contained in the wallet on the table. Hill said, "No, we want real money. We know you have it. We have a straight tip on you. You have been beating the government on your income tax and you have got the money here in the house. You have got real money and we want it." Mr. Bodkin assured them he had no other money and the defendants repeated several times their demands at the same time walking back and forth brandishing their weapons. One of them asked Mrs. Bodkin if she had any money whereupon she took out her pocketbook containing $24 and placed it on the table. When the $24 was produced one said, "No, we want real money. You have got real money and we are going to get it, and we are not going to leave here until we get it."

After much walking from room to room, and searching of the premises and making positive statements that large sums of money were concealed in the house, one of the defendants gave the order to search the fur coat which Mrs. Bodkin was wearing. She had her three diamond rings—an engagement ring, a wedding ring and a dinner ring—in her coat pockets. The value of said rings was approximately $2,000. When ordered to remove the coat she took out the rings, saying, "Here are my rings." She placed them on the table with the money that they had taken from Mr. and Mrs. Bodkin. They insisted most strongly that money was concealed in the house and that they did not intend to leave until it was forthcoming. The telephone wires were

cut. Mrs. Bodkin, the maid and the boy were taken out of the room and placed against their protest in a small closet which had no window or means of ventilation. A heating pipe which was laid in the closet wall added to the discomfiture of the occupants. The door was locked. It was suggested that a larger closet with a window in it was available, but the defendants refused to remove the occupants to the other closet. As they were taken to the closet by Tanner, Hill said, "We will have to give him [Bodkin] a working over." He was required to take off his shoes. Hill then gave the order, "Tie him down." His hands were then tied behind and made fast to the chair he sat in with wire which the defendants brought with them. Defendants frequently iterated and reiterated the statement, "We have got to have more money; we know you have it." Finally they said, "We will have to make him talk." Tanner took a position behind Mr. Bodkin and Hill stood before him with cocked pistol pressed to his chest in the region of the heart, and in a menacing tone said, "Now, talk; tell us where that money is." Mr. Bodkin again told the defendants there was no more money in the house, and that if there were he would gladly give it to them. Mr. Bodkin's appeals had little effect. Hill said, "Bring out the woman." Mrs. Bodkin was brought into the room and seated. Both said, "We have got to make them talk." Hill then said to Mrs. Bodkin, "How would you like to see his [Mr. Bodkin's] body floating around in the bay? Now you had better talk or that is what is going to happen. We haven't got rough yet. We have got another gang outside and if you do not talk, we will let them in and they will tear this joint up."

Mrs. Bodkin used her best persuasive powers to convince the defendants that there was no other money in the house. All attempts to compel the Bodkins to bring forth or reveal the hiding places of any large sums of money having failed, one of the defendants said, "We have got to give them a little heat." Mrs. Bodkin became quite overcome at the suggestion and begged the defendants not to hurt her husband. Tanner then tore the heavy cover off a Christmas magazine, made it into a torch and lighted it and applied it to Mr. Bodkin's hands, which were tied behind him. Mr. Bodkin cried out at the pain. After the magazine cover was totally consumed, Hill said, "I believe

you are telling the truth . . . I think we have got a bum steer. Wait until we get ahold of that man, that party who gave us this bum steer, and we will take care of him.''

The defendants had a whispered conference. Mrs. Bodkin said she had cashed a $25 check that day and spent one dollar. The $24 on the table represented the balance. Tanner requested her to produce the stub and upon doing so the defendants carried on a whispered conversation and left the premises. Before leaving, however, they started to return Mrs. Bodkin, the maid and the boy to the closet, but upon the protests of all that they would suffocate if returned, they were brought out to the dining room, and bound hand and foot with ropes and wire. Mr. Bodkin had been securely bound. Upon leaving they were told not to give an alarm for forty-five minutes, and that they might know the time, Tanner placed Mr. Bodkin's watch in a place where he might see the time. Hill said that an automobile containing a machine gun was across the street and anyone attempting to leave the premises before the expiration of forty-five minutes would be shot. Upon leaving Tanner and Hill took all of the money and the three diamond rings above described.

The defendants were actually in the presence of Mr. Bodkin for a period of one hour and ten minutes, and in the presence of the members of the household the greater part of this period. Mr. Bodkin had seen and talked with Tanner before he lifted the handkerchief over the lower portion of his face. He conversed with and measured the height and form of both defendants with his eyes and employed all other senses, faculties and powers of discernment and identification with which normal persons are endowed. Mr. Bodkin is a lawyer and there can be no doubt that he studied the features and characteristics of the men with whom he was in close personal contact for more than an hour with unusual care and with a consciousness of what misidentification would mean to the accused. Mr. Bodkin, Mrs. Bodkin, the maid and the son expressed not the least doubt as to the identity of Tanner and Hill. In addition to this personal identification, we have defendant Hill coming forward and admitting his part in the conspiracy and detailing minutely the part that Tanner and Brooks played in the commission of the crime. His testimony is strongly corroborated by independent facts and circumstances.

Brooks did not directly participate in the commission of the crime, but it appears that he was the directing mind in plotting the crime and that he is more adept and cunning than either of his confederates. At the time of his arrest he was living at 2960 West Ninth Street. He was a confessed bootlegger, and had been plying his trade for some time. He operated his liquor order business from said number. It will not be possible to point out all of the evasions, contradictions and improbabilities with which he is confronted by the record. His subsequent contradictions of prior statements no doubt caused the jury to distrust his testimony *in toto*. The evidence is sufficient to sustain the conclusion that he was a guilty participant in the commission of the acts above and hereafter to be narrated.

■■ Appellants strenuously contend that the testimony of the accomplice is not corroborated by other evidence tending to connect the defendants with the commission of the offense. We are of the view that under the rule announced in the case of *People* v. *Kemply,* 205 Cal. 441 [271 Pac. 478], which is but the restatement of a well established rule, the corroborative evidence in the present case satisfies all legal requirements. Such corroborative evidence need not tend to establish the precise facts testified to by the accomplice. It is sufficient if such corroborative evidence standing alone tends to connect the defendant with the commission of the crime charged. Brooks first denied that he was acquainted with Hill. That Hill had had wine sale transactions with him and that this acquaintance was of long standing, Brooks was finally forced to acknowledge.

A brief statement of the relationship of Tanner, Brooks and Hill and one or two other characters whose shadows frequently flit across the picture is necessary to appraise the corroborative force of the evidence upon which the People rely. That Tanner, Hill and Brooks were sympathetic with devious methods of acquiring money there can be no doubt. One J. B. Kyte was a dealer in second-hand automobiles, occupying a lot at No. 813 East Fifth Street. Tanner and Hill and other traders in second-hand cars made Kyte's place their rendezvous. Brooks was undoubtedly acquainted with Tanner, Hill and other questionable characters who made Kyte's lot their headquarters. The preparation for the commission of the crime as told by Hill may be thus briefly summarized:

At about 4 o'clock, December 16, 1933, Tanner and a driver whose identity was not established called for Hill and the defendants were driven to an apartment house on West Ninth Street, where Brooks had apartments. This was also the place from which he conducted an illicit wine and liquor business by telephone and personal contacts. When Hill left for Brooks' residence he supposed he was going to a mine in which the two seemed to have had some sort of interest. Hill placed his working clothes in the automobile and proceeded with Tanner to Brooks' apartment. A man by the name of Ed Guyer, a friend of Brooks', whom Hill had met at said mine, was at Brooks' apartment. Brooks asked Hill if he wanted to make some easy money. Hill replied that he would like to get the lawsuit over the mine ended so he could get possession; that his wife was very sick, which was a fact, and if she died he did not have enough money to bury her. Brooks said they could make money easier than that. He then outlined the Bodkin plot. Brooks said that a man, presumably Mr. Bodkin, had $150,000 in cash in his house, and between $60,000 and $80,000 in jewelry. He further said, "I am going to get it tonight." He asked Hill if he would like to help get it and he replied that he had never done such a thing in his life. Brooks said to Hill that he knew what they were planning to do, and that he was going to help. Hill replied that he did not want to join in the crime. Brooks said, "If you don't you have got to keep your mouth shut. If you don't, it takes just one bullet to shut it." He picked up two guns lying on a table. Tanner took one of the guns and the other was handed to Hill. Tanner went to the car and brought out Hill's old clothing, and the change was made in Brooks' room. Handkerchiefs were furnished by Brooks and tied about the necks of each man in such manner that they might readily serve as masks. The men were furnished with wire cord and rope by Brooks.

While they were discussing the plan of the job, Guyer, Tanner and Hill were present. Guyer, who was well known to both Hill and Brooks, did not appear at the trial of the case and his presence was unaccounted for. Hill was not sure as to the identity of the driver of the car. Tanner and Hill left the automobile some distance from the Bodkin home, with the driver at the wheel. There is some sugges-

tion that another car followed the Tanner and Hill car and parked opposite Bodkin's home.

Upon leaving the Bodkin home, Hill and Tanner, in the same car and with the same driver who transported them to said home, returned to the Brooks apartment, where they found Brooks alone. Upon entering Brooks' apartment both Tanner and Hill took what money they had extorted and the three diamond rings from their pockets and placed them in a heap on a table. Brooks asked if that was all and Tanner replied that it was. Brooks then asked if they made him talk, and Tanner replied that they could not make him talk. Brooks said he knew the money was there. Tanner said he applied the heat to him and still he would not talk. Brooks said, "I will get him again. I know it is there." Brooks said that a man named Lorraine had given him the information, and he expressed some doubt as to whether he had given him a "bum steer". Brooks gave Hill a dollar and told him to get out of his clothes and go home. He changed his clothing, leaving the old clothes at Brooks' apartment. He did not see Brooks again until December 20th, at which time he went to see Brooks to try to recover the jewelry which had been taken from the Bodkins' home. Evidently the police had a clue as to the perpetrators of the crime. Hill told Brooks that they were going to get into trouble. Brooks refused to consider the matter and ordered him out of his apartment.

On December 21st, five days after the commission of the crime, Hill and Tanner were arrested at Hill's apartment, and a little later on the same day Brooks was arrested at his apartment. Mr. Bodkin accompanied several police officers when they arrested Brooks. Mr. Bodkin testified that immediately upon entering Brooks' room Officer O'Connor said to Brooks: "Where are the rings, the diamonds? The boys said they left them here." Brooks said: "No, they had them out here, but they took them away." The officer said he knew the rings were there, to which Brooks replied that they were not there. On December 26th the three diamond rings were found under Brooks' window by his landlady. Between his apartment and the adjoining residence there exists a strip of unused ground seven feet in width, which was somewhat covered with vegetation. The landlady was cleaning up the yard at the time she dis-

covered a chamois skin bag which contained the three diamond rings which had been taken from the Bodkin home. The apartment house was a two-story building. Brooks' room was on the second floor. One of the windows of his room is directly over the spot where the bag was found. A small portion of the window pane, sufficiently large to permit the passing of the bag, was found to be broken out. The keyhole in the door opening into Brooks' room had been plugged by him. This was done about the time of or shortly before December 16th. Brooks said that he had lost some personal articles by theft, and that was the reason he plugged the keyhole. He had not, however, reported any such loss to the landlady, or the police, or anyone else. A copy of the "Los Angeles Examiner," published December 17th, the next morning after the crime was committed, was lying on the radio. The exposed part of the newspaper contained this headline in large type: "Lawyer Held Up By Bandits and Tortured." When questioned as to how he came to retain that particular paper he said he didn't know how the paper came to be preserved; that he hadn't seen the paper and knew nothing about it being there. Upon being asked what he did and where he was Saturday evening, December 16th, he said that he didn't know. The officers discovered a pistol holster and a large box of pistol shells in one of his closets. He appeared pale and nervous and took a drink of whisky to quiet his nerves. When first confronted with Hill he denied that he ever knew him. On another occasion he said that he believed Hill was at his apartment on the evening of December 16th, but he was busy 'phoning and had no conversation with him. He further stated that he had a bad cold at the time he was arrested and that he had drunk so much whisky as a remedy that he was oblivious to passing events.

Brooks' testimony, together with his statement, covers a large number of pages and taken as a whole it is difficult to pick out the portions which are entitled to credence. The man Lorraine, who is believed to be the man who gave him the information as to Mr. Bodkin's wealth, is known to have been in communication with him very soon after the crime had been completed. Hill testified that he understood from Brooks that Lorraine was his informant. Whether or not there was a cross-up on the part of the perpetrators of the crime as to the house which it was

understood contained large sums of money and jewelry, does not satisfactorily appear from the record.

Mr. Bodkin kept the carton which was supposed to contain the present Tanner and Hill made a pretense of delivering to him. In size and shape it corresponded with the cartons which Brooks used in his bootlegging business. It had the word *claret* printed on it. Of course it may have been used as a container for port wine or any other variety. It was such a carton as was popularly used by bootleggers. Brooks boldly asserted to the officers that he was a bootlegger. We are convinced that what has been set forth herein does tend to connect the defendant Brooks with the commission of the crime.

■ Both defendants Tanner and Brooks offered evidence which, if believed, would tend to establish the defense of alibi. Their testimony and the testimony of their witnesses generally is not impressive. Weighed against them is the testimony of four intelligent and apparently credible witnesses, who were under the personal control of Tanner and Hill for a period of more than one hour under circumstances which caused them to scrutinize their physical characteristics by every test that the human powers of identification are capable of calling to their aid. It is true that masks partially hid the lower portions of their faces. It is also true that one did not use a partial mask at the beginning, and his face was fully exhibited to Mr. Bodkin. Proof of the guilt of defendants Tanner and Hill bore so heavily upon Hill that he admitted his part in the crime. Tanner stood upon the sole plea of not guilty until the evidence began to establish his guilt beyond a reasonable hope of escape, and, realizing that the inevitable was before him, he asked and was granted permission to withdraw his plea of not guilty and interpose the additional plea of not guilty of the offense by reason of insanity.

Brooks, if the evidence offered by the prosecution is true, is more guilty than either of the other two. The jury having found him guilty upon competent evidence sufficient in its probative effect to sustain the verdict, said verdict is conclusive on this court.

■ We now come to the consideration of the second major objection raised by appellants, which is directed at the validity or constitutionality of section 209 of the Penal Code, as amended the second time during the closing days of

the 1933 session of the legislature. Two amendatory sections were passed. The first became effective August 21, 1933, and the second, which is the one now under discussion, became effective October 25, 1933. Both sections are identical in subject-matter, with the exception that the second amendment provides a much severer penalty than does the first in case the offense therein defined is accompanied by bodily harm.

It is contended that the title of the 1933 amending section 209, which is entitled "An act to amend section 209 of the Penal Code relating to the punishment of kidnaping," is insufficient in that the subject-matter exceeds the express limitations of its caption. In other words, the amendment is not germane to the title. With this contention we cannot agree. We think there are sufficient grounds upon which the validity of the amendment may rest. Section 209, being the original section herein amended, was added to Chapter III, entitled "Kidnaping", in 1901. It was entitled "An act to amend the Penal Code of California by adding a new section thereto, to be numbered two hundred and nine, relating to crimes and penalties." It appears in the code in this form: "Penalty for kidnapping for purposes of extortion or robbery." It provides that "every person who maliciously, forcibly, or fraudulently takes or entices away any person with intent to restrain such person and thereby to commit extortion or robbery, or exact from the relatives or friends of such person any money or valuable thing, is guilty of a felony, and shall be punished therefor by imprisonment in the state's prison for life, or any number of years not less than ten." It will be noted that the forcible taking of any person with intent to commit extortion or robbery, the exact offense of which the defendants were convicted, is made a felony. The only change made by the amendments of 1933 so far as they affect the instant case was to increase the penalty if the person forcibly taken suffers bodily harm.

The act of October 25, 1933, under which the appellants were convicted, is entitled "An act to amend section 209 of the Penal Code relating to the punishment of kidnapping." It reads: "Every person who seizes, confines, inveigles, entices, decoys, abducts, conceals, kidnaps or carries away any individual by any means whatsoever with intent to hold or detain, or who holds or detains, such individual

for ransom, reward or to commit extortion or robbery or to exact from relatives or friends of such person any money or valuable thing, or who aids or abets any such act, is guilty of a felony and upon conviction thereof shall suffer death or shall be punished by imprisonment in the state prison for life without possibility of parole, at the discretion of the jury trying the same, in cases in which the person or persons subjected to such kidnapping suffers or suffer bodily harm or shall be punished by imprisonment in the state prison for life with possibility of parole in cases where such person or persons do not suffer bodily harm.'' (Stats. 1933, p. 2617.)

The act of 1901, as above set out, provides that every person who forcibly takes any person with intent to restrain such person and thereby to commit extortion or robbery is guilty of a felony. The section as amended provides that every person who seizes, confines, kidnaps or who *holds* or *detains* any person for the purpose of committing extortion or robbery is guilty of a felony. The same elements, to wit, the forcible taking of a person with intent to extort from such person money or other valuable thing, or with the intent to commit robbery, enter into and constitute a felony, and the name given to the crime specifically defined is immaterial in such circumstances. Appellants concede that a valid amendment to a code section may be made by reference to its number. The amendment was made by reference to the code section in the instant case. No confusion could possibly arise as to acts which constituted a felony upon reading the original and amended sections. It is true that the term ''kidnaping'' was used in the title of the amendment, but it could not have misled anyone in view of the code section reference and the acts set forth in the code section describing the particular felony. The acts made punishable by the amendment were also punishable under the provisions of the original section. The amendment so far as it affects the appellants herein relates only to increased punishment. The title of the original section is ''An act to amend the Penal Code by adding a new section thereto to be numbered 209, relating to crimes and penalties''. This is a very comprehensive title and kidnaping has always been classified as a crime. It is certainly a felony. So it may be said that the title of the 1933 amendment makes specific reference to a numbered section of the Penal Code, which increases the

penalty for the commission of the offense described in said code as a felony. The original section, which has existed as a code section for thirty-three years, is prefaced by the following (prepared by the annotators of the code) introductory line, printed in bold face type: "Sec. 209. Penalty for kidnapping for purposes of extortion or robbery." The code annotators were doubtless brought to the conclusion that the felony therein described was, speaking specifically, kidnaping. However this may be, we feel satisfied that neither the lawmakers who framed the amendment nor the public upon which it operates have been or will be deceived or misled by the title of the amendment.

Objection is made to the statute of 1933 on the ground that a number of the acts therein set forth describing kidnaping widely depart from the common-law requirements which consisted of the forcible abduction or stealing away of a person from his own country and carrying him into another, and inasmuch as the acts described by the evidence contain no flavoring of the ingredient of the common-law requirement as to the carrying away of the person kidnaped, the contention is made that the crime described by the evidence is not within the purview of the offense of kidnaping. It is true that many of the acts which are made punishable by statute as kidnaping differ as widely from those which anciently constituted kidnaping as do the particular social and economic conditions which gave rise for the necessity of the enactment of penal statutes as protection against the dangers peculiar to their times, differ from each other. Anciently, kidnaping was defined to be "the forcible abduction or stealing away of a man, woman or child from their own country and sending them into another, [and] was capital by the Jewish law. 'He that stealeth a man and selleth him, or if he be found in his hand, he shall surely be put to death.' (Exodus, XXI, 16.) So likewise in the civil law, the offense of spiriting away men and children . . . was punished with death. This is unquestionably a very heinous crime as it robs the King of his subjects, banishes a man from his country and may in its consequences be productive of the most cruel and disagreeable hardships . . . " (2 Cooley's Blackstone, 4th ed., p. 1379.)

The common-law definition of kidnaping has long since become obsolete and has passed with the particular primitive civilization in which the offense as originally defined was

practiced. The offense has since been redefined by statute in a number of states, domestic and foreign, to meet the requirements of modern conditions. Its ancient definition would mean nothing in the way of deterring criminals from the commission of such crimes as our statutes were designed to prevent. It is the duty of legislatures, without regard to allegiance to archaic forms, to enact laws adaptable to the protection of the citizen in the enjoyment of life and property. The common law has been supplanted by statutory law in this state since 1872. Section 4 of the Civil Code provides: "The rule of the common law, that statutes in derogation thereof are to be strictly construed has no application to this code. The code establishes the law of this state respecting the subjects to which it relates, and its provisions are to be liberally construed with a view to effect its objects and to promote justice." No reason has been given why it is not within the purview of the sovereign power of the state to pronounce or classify as an act of kidnaping (following closely the language of the statute), the act of seizing and *confining* a person by *any means whatever,* with intent to *hold* such person for ransom or reward, or to commit *extortion* or *robbery,* and also to provide as a penalty that if such person suffers bodily harm at the hands of the kidnapers the punishment shall be death or life imprisonment at the discretion of the jury or judge trying the case. The crime as defined by section 209 of the Penal Code enlarges upon the offense of robbery at common law, which was defined to be "larceny committed by violence from the *person* of one put in fear". Conceding that some or all the elements of robbery form a material part of the definition of kidnaping, that fact would not deprive the legislature of the right of including said acts in a restatement of the offense of kidnaping and prescribing a greater penalty for its commission. In the instant case there was a forcible possession of the bodies of the victims who were bound and held captive and terrified by threats of defendants Tanner and Hill of resorting to the most shocking and painful means of inflicting death or injury upon the victims for the purpose of extorting property from them. Gain has always been the motive of kidnapers.

There can be no good reason for doubting the power of the legislature to impose the extreme penalty of the law upon persons who commit offenses in the manner and by the

means employed by the defendants in the instant case, who carried loaded weapons for no other purpose than to use them upon the slightest show on the part of the victims to gain their release or to give an alarm that would thwart them in their designs.

It is the contention of appellants that no bodily harm was suffered by any of the parties against whom the crime was committed. It will be noted that the statute does not use the words actual bodily harm, or great bodily harm, or bodily injury. Bodily, used singly, is defined as pertaining to the body. It is opposed to mental "as bodily labor or pain; physical is often synonymous with bodily, as physical discomfort, suffering. Harm is defined as "hurt; injury; damage; (2) grief, pain, sorrow; (3) evil; wrong; wickedness." (Webster's International Dictionary, 2d ed.) *Bodily harm* is generally defined as "any touching of the person of another against his will with physical force in an intentional, hostile and aggravated manner, or projecting of such force against his person". (8 C. J. 1134; *People* v. *Moore,* 50 Hun (N. Y.), 356 [3 N. Y. Supp. 159]; 1 Words and Phrases, p. 817; *King* v. *Hostetter,* 7 Canadian Criminal Law, 221.) There can be no doubt that applying fire to the hands of a person in the manner described by the witnesses in the instant case to the degree that it causes such person to suffer acute pain, is to do bodily harm. To bind persons in the manner in which the Bodkins were bound is to do them bodily harm. Mrs. Bodkin, while not subjected to the ordeal of fire, was imprisoned in a close and overheated closet, three by five feet in dimension, with two other persons for quite a period, and was finally left bound with the other members of the household. These acts unquestionably amount to bodily harm.

Counsel for appellant Tanner criticises the legislature for passing the amendment which provided the death penalty as punishment for the crime committed by the appellants as an emergency measure during the last days of the legislative session. He challenges the procedure and questions the motives of the members of the legislature who were pressing the passage of said amendment. The suggestions that it was the result of an aroused public feeling against kidnaping is no reason why it should be condemned as invalid. Perhaps every measure adopted is the result of

a public need or demand. Courts are not empowered to enter the field of legislation and to set up their judgments as to questions of policy or expediency as against the findings of the legislative body on matters which are purely legislative. ''The fixing of penalties for crime is a legislative function. What constitutes an adequate penalty is a matter of legislative judgment and discretion and the courts will not interfere therewith unless the penalty prescribed is clearly and manifestly cruel and unusual. Where the sentence imposed is within the limits prescribed by the statute for the offense committed, it ordinarily will not be regarded as cruel and unusual [citing authorities]. Kidnaping is a heinous offense. A sentence to *life imprisonment for transporting* a kidnapped victim in interstate commerce, or for conspiracy so to transport a kidnapped victim, is not, in our opinion, cruel and unusual punishment within the constitutional inhibition.'' (*Bailey* v. *United States,* 74 Fed. (2d) 451.) (Italics ours.) An attempt to wreck a railroad train by doing any of the acts set forth in section 219 of the Penal Code is made punishable with death at the option of the jury trying the case. So also is treason and assaults made by persons serving a life sentence in a state prison who commit an assault upon the person of another with a deadly weapon or instrument, although life is not taken, punishable by death. The judgment of the legislature in such cases will not be nullified by courts where the enormity and heinousness of the crimes are apparent. In passing the act challenged, the legislature acted in response to the will of the people. That it had the power to provide the infliction of the death penalty in such cases, cannot be disputed. That the home life of the state and nation was frequently being brutally invaded by kidnapers, and the peace and safety of the citizen was being threatened at the time the amendment in question was adopted, was a matter of common knowledge and concern, and the fact that the legislature hastened to adopt such measures as in its judgment would tend to protect the citizen against kidnaping furnishes no ground for the claim that its act was without mature deliberation and consideration on a very important matter of legislation. It has not been pointed out that the legislature failed to follow the procedure provided by law in the

adoption and passage of said amendment. Its validity appears to be unimpeachable.

Many other assignments of error are presented on the appeal, but we have examined them all and found no real merit in them. It was not error correctly to give the jury the law as to conspiracy. The fact that conspiracy was not pleaded in the indictment did not preclude the prosecution from proving the existence of a conspiracy if one actually existed. The district attorney was not guilty of misconduct in the presentation of the case, nor did the court commit prejudicial error in refusing to exclude the witnesses from the courtroom until after they had testified. No errors of law appear to have been committed by the court in giving its charge to the jury. No other matters occurring at the trial require consideration.

The judgments and orders appealed from are affirmed.

Shenk, J., Thompson, J., Waste, C. J., and Curtis, J., concurred.

Rehearing denied.