[Crim. No. 3637. Second Dist., Div. One. June 3, 1943.]

THE PEOPLE, Respondent, v. CECIL H. SALTER et al., Appellants.

Morris Lavine and David L. Sefman for Appellants.

Robert W. Kenny, Attorney General, R. S. McLaughlin, Deputy Attorney General, Fred N. Howser, District Attorney, and Clifford Crail, Deputy District Attorney, for Respondent.

YORK, P. J.—By an information, appellants were charged jointly in three counts with kidnapping for the purpose of robbing Mr. and Mrs. Sherman and Mrs. Whitehouse, respectively; in the fourth count with robbing Mrs. Sherman of a diamond ring; in the fifth count with assaulting Mr. Ide with a deadly weapon, and in the sixth count with attempted robbery of Mr. Ide. In addition, each appellant was charged with a prior conviction, which they first denied and then admitted. During the trial, the fifth count was dismissed as to both appellants upon motion of the prosecution.

Appellant Homotoff appeals from the judgments of conviction of the offenses, as charged in the information, and from the order denying his motion for a new trial. Appellant Salter appeals only from the judgments of conviction.

Although appellants have filed separate briefs, appellant Salter's brief adopts the statements contained in appellant Homotoff's brief, adding thereto the assertion that the evidence produced against him is insufficient to establish the kidnapping of Mr. and Mrs. Sherman and Mrs. Whitehouse of which both appellants were found guilty.

It is here contended that the prosecutor committed prejudicial misconduct; that the verdicts were against the law and the evidence; that the evidence was insufficient to support the verdicts, and that the evidence attempting to connect appellants with the crimes charged was unsubstantial and insufficient.

Around eight o'clock in the evening of July 23, 1941, Wesley M. Sherman, who was employed as a bookkeeper by Motor Discount Company, 1717 South Figueroa Street, Los Angeles, left the office of said company and drove his automobile to his home at 380 Dearborn Street, Pasadena, where he resided with his minor son, his wife, and the latter's mother, Mrs. Louise Whitehouse.

It appears that appellants and one Arthur Toube, who jointly had been engaged in a course of criminal conduct,

including the commission of the crimes of burglary and robbery, had been watching the office of the Motor Discount Company and for some time had been shadowing Mr. Sherman in the belief that he had money in his house belonging to this company.

On the evening in question, with Toube driving the car in which appellants were riding, they saw Mr. Sherman coming out of a driveway in his automobile in the vicinity of Motor Discount Company's office on South Figueroa Street, and at appellant Salter's suggestion, they followed Mr. Sherman's car and stopped approximately one-half block from the Sherman residence. Toube remained in the car and appellants got out and ran down the driveway into Mr. Sherman's yard.

When Mr. Sherman attempted to leave his garage, after parking his car, he was accosted by one of the appellants who was armed with a gun which he pointed at Sherman's stomach. This man ordered Sherman ''to get in the car and keep quiet . . . this is a holdup,'' to which Sherman replied he would do anything the man wanted if he would not harm his family. Mrs. Sherman and their minor son were then inside the house. About this time the second appellant stepped up, also armed with a gun, and both men insisted that Sherman ''go get the money'' for them, while he kept reiterating that he did not have any money. Meanwhile, Mrs. Whitehouse (Mr. Sherman's mother-in-law) returning from a drugstore where she had been on an errand, walked into the driveway and approached the group. The two armed men immediately ''covered'' her with their guns and informed her it was a ''holdup,'' and at this juncture Toube joined the group, having remained in his car in front of the house up to this point. Mrs. Whitehouse was ordered into Mr. Sherman's car by one of appellants, whereupon both appellants accompanied Mr. Sherman into his house, where they encountered Mrs. Sherman in the bedroom. Appellant Salter ordered her to get out of bed and appellants then took from her the sum of $2.85 which she had in her purse. After appellants were told repeatedly that Mr. Sherman had no money, they ordered the Shermans to go into the kitchen, where appellant Salter quizzed them about the combination to the Motor Discount Company's safe. After they were told that Mr. Sherman did not have the combination to the safe, the appellants ordered

the Shermans to go out and get in their car, which they did, joining Mrs. Whitehouse who was seated therein and who was being guarded by Arthur Toube, as he had been directed to do by appellant Salter. After a conference between Toube and appellants, it was decided that appellant Homotoff should stay in the kitchen of the house and guard Mrs. Whitehouse until he was notified by telephone that the criminal enterprise was completed; and that the Shermans should accompany Toube and appellant Salter, Toube driving the Sherman car, to the home of Corson Ide, president of the Motor Discount Company. Mr. Sherman did not know where Mr. Ide lived, but Mrs. Sherman stated: "If you will let my mother stay at home, I will direct you to Mr. Ide's house."

When they reached the Ide house, Mr. Sherman was ordered by appellant Salter to get out of the car and accompany him, and Toube was told to guard Mrs. Sherman in their absence. Mr. Ide was not at home, but it was ascertained from a member of his household that he was playing bridge at the home of a neighbor. Appellant Salter returned with Mr. Sherman to the car and they proceeded to the home of Dr. Parker, whereupon appellant Salter directed Mr. Sherman to leave the car and accompany him to the Parker house. Mr. Ide was called to the front door by Mr. Sherman. Meanwhile, appellant Salter was hiding behind bushes near the door, covering Mr. Sherman with his gun. When Mr. Ide appeared at the door, Mr. Sherman attempted to persuade him to accompany him to the company's office in Los Angeles. This Mr. Ide refused to do, but he was finally induced to walk out to the car with Mr. Sherman, being unaware of the presence of appellant Salter. However, as Mr. Ide took a few steps across the porch from the door, appellant Salter confronted him with the gun and endeavored to force him into the automobile. This attempt was frustrated by Mr. Ide, who suddenly turned and dashed back into the house. Appellant Salter then made a "grab" for Mr. Sherman, who escaped him, whereupon appellant Salter ran to the car, took the driver's seat and drove away with Toube sitting beside him and Mrs. Sherman restrained in the back seat. After encountering some difficulty in finding their way out of Pasadena, the car was stopped near a service station where Toube left the car and telephoned to Homotoff instructing him to

leave the Sherman residence. The car was then driven onto the Freeway between Pasadena and Los Angeles on the wrong side thereof at approximately 80 miles per hour. Somewhere near Los Angeles, Mrs. Sherman was robbed of her diamond ring and then released. This ring was later given by appellant Salter to Virginia Ballard, an acquaintance. During the absence of Toube, appellant Salter, and the Shermans, Mrs. Whitehouse was detained and guarded in the kitchen of the Sherman home by appellant Homotoff, who released her and left the house after receiving the telephone call from Toube.

The appellants urge that the deputy district attorney committed prejudicial misconduct when, in his argument to the jury at the close of the case, he made the following remarks concerning the testimony of the witness Arthur Toube, an admitted accomplice:

"If there is any testimony that will assist the jury in arriving at the truth in a situation of this kind, I am going to bring it into court, because I don't want you folks to speculate. I want you folks to be convinced, and you can only be convinced when I have brought you all of the evidence that is available. Certainly I brought Mr. Toube in, and I am vouching for Mr. Toube's integrity. . . . If I didn't think that Arthur Toube was telling the truth, or that he didn't intend to tell you the truth, I wouldn't have put him on the witness stand. . . I didn't have to bring Arthur Toube in here—Mr. Lavine is right but I have brought him in here. And when I bring him in here I write my endorsement on his testimony, that he is telling you the truth, just as I do the testimony of any other witness."

Appellants contend that "the effect of the prosecutor's statement was to give the testimony of the accomplice greater weight than to that of an ordinary witness, in violation of the provisions of section 1111 of the Penal Code. . . ."

"Courts are strongly inclined against setting aside convictions upon the ground of misconduct of district attorneys alone. Such misconduct, therefore, is not ground for a reversal when it is unimportant, or slight, or when it cannot prejudice the defendant, or when it appears that the verdict could not have been controlled or affected by it, as where the evidence is such that it is inconceivable that any honest jury could have found any other verdict in the absence of any dereliction on the part of the district attorney. A judgment will not be

reversed because of the misconduct of the district attorney except in clear and extreme cases, and unless the misconduct is flagrant and obviously prejudicial, and unless, in the opinion of the appellate court from a review of the entire record, it results in a miscarriage of justice. Counsel's conduct must reach a course of proceeding militating against justice and the fair and orderly conduct which should characterize a judicial proceeding in a criminal case before error can be predicated upon it. There must be willful error persisted in for an illegitimate purpose, followed by injustice to the prisoner." (8 Cal.Jur. 621, 622, sec. 602, and authorities there cited.) See, also, *People* v. *Kennedy*, 21 Cal.App.2d 185, 207 [69 P.2d 224].

In the case of *People* v. *Cowan*, 38 Cal.App.2d 231, 246 [101 P.2d 125, 135], the deputy district attorney in his opening argument when discussing the credibility of one Malter, his most important witness, stated: "I take this responsibility and say unto you, that we are not putting on that kind of a man before you and asking you to believe that that we do not believe ourselves, that we are not absolutely convinced of, and I will tell you that I am saturated with the confidence and the knowledge that Morris Malter has told you the truth about what this conspiracy was about." It was there held: "It should be admitted that the [district] attorney should not have stated that he had *knowledge* that Malter was telling the truth. Otherwise the statement is nothing more than a summary of what should be common knowledge of the ethics to be used by a reputable prosecutor. No such official should attempt to convict defendants on evidence that he does not believe to be true. This portion of the argument was innocuous and could not be regarded as prejudicial. The insertion of the single word 'knowledge' into what was otherwise a harmless argument hardly had sufficient emphasis, when taken with the context, to mislead the jury, especially in view of the many and often-repeated instructions to the jury that they could not consider any statement of counsel as evidence nor give it any weight as such."

At no time during the trial in the instant case did the prosecutor express an opinion regarding the guilt or innocence of appellants, nor did he express an opinion based on independent knowledge or facts outside the record. There was no statement that he knew the witness Toube or had ever

talked to him. Under the circumstances, it cannot be said that the statements objected to were so prejudicial to the cause of appellants as to warrant a reversal of the judgments.

Appellants urge that the testimony of the witness Toube should be disregarded because of his base character and furthermore that his evidence, concerning appellant Homotoff's participation in the offenses charged against him, was uncorroborated.

■ The jury is the sole judge of the credibility of a witness. (*People* v. *Connelly*, 195 Cal. 584, 593 [234 P. 374].) In that case a similar argument was advanced, that is, that the witnesses for the People were ex-convicts and law violators. The court held that the jury and the jury alone could decide whether such witnesses were worthy of credence, and the jury having made the decision it is final.

■ In the instant case, the evidence of appellants' guilt of the crimes of which they stand convicted is conclusive, and the testimony of the witness Toube was sufficiently corroborated as required by section 1111 of the Penal Code, for the reason that both Mr. and Mrs. Sherman identified appellant Salter as one of the perpetrators of the crime against them, and Mrs. Whitehouse positively identified appellant Homotoff as the man who held her captive while the robberies and other kidnappings were being perpetrated. Mrs. Whitehouse's identification was based upon her observation of appellant Homotoff in a lighted room where the fluorescent tube light over the stove "lit up the whole kitchen," when she pulled off his hat so that she could see him. Appellants complain that the testimony of Mrs. Whitehouse is weak because she was unable to see alleged scars on appellant Homotoff's face when he stood a distance of from three to four feet from her in the lighted courtroom. However, the jury was satisfied with the witness' intelligence, age and vision and accepted her story as it had a right to do in finding appellant Homotoff guilty. ■ It is also urged by appellants that Mrs. Whitehouse was not kidnapped. She testified that she was ordered into the car by these men and also ordered into the house by them, and that she complied because they were armed. This is sufficient evidence from which the jury might infer that she was acting under duress and force. (See *People* v. *Tanner*, 3 Cal.2d 279 [44 P.2d 324].)

■ The facts adduced at the trial herein establish that a

general conspiracy existed between appellants Salter and Homotoff and the witness Toube to commit robberies and burglaries, and that the crimes committed by these three men on July 23, 1941, were in furtherance of such conspiracy.

Mrs. Sherman testified that Salter, Homotoff and Toube made their plans as to the manner in which the robbery should be carried out in the presence of herself, her husband and her mother; that Salter and Toube should take her and her husband with them to get the combination of the safe from Mr. Ide, and that they should leave Homotoff to guard her mother, Mrs. Whitehouse, in their absence. The kidnapping and robbery of Mr. and Mrs. Sherman and the attempted robbery of Mr. Ide were within the scope of the conspiracy, and appellant Homotoff is bound by the acts of his co-conspirators. ■ It is not necessary that there be a moving or carrying away of the victim in order to constitute the crime of kidnapping. The act of seizing an individual or restraining him through fear is as much a violation of the law of kidnapping as if he were carried away and concealed. (*People* v. *Tanner*, 3 Cal.2d 279, 295, 297 [44 P.2d 324]; *People* v. *Raucho*, 8 Cal.App.2d 655, 665 [47 P.2d 1108].) The Shermans and Mrs. Whitehouse were seized and confined before the departure of the Shermans from their home, all in the presence of appellant Homotoff.

An examination of the entire record herein shows sufficient substantial evidence to support the judgments of conviction, and that the errors committed during the trial were not sufficiently prejudicial to require a reversal of the judgments.

The judgments and order appealed from are affirmed.

Doran, J., and White, J., concurred.

Appellant Homotoff's petition for a hearing by the Supreme Court was denied July 1, 1943.