[Crim. No. 1462. Third Appellate District.—May 27, 1937.]

THE PEOPLE, Respondent, v. CLARENCE KENNEDY
et al., Appellants.

Ira B. Langdon for Appellants.

U. S. Webb, Attorney-General, Wilmer W. Morse, Deputy Attorney-General, F. C. Clowdsley, District Attorney, and R. M. Dunne, Assistant District Attorney, for Respondent.

THOMPSON, J.—Two indictments were returned against the appellants and C. C. Melton, jointly charging them with violations of the election laws. Melton confessed the crimes and was sentenced to state prison at San Quentin. He also became a witness against the appellants and testified to the entire transaction implicating both of the appellants in the crimes with which they were charged. The indictments were couched in several different counts. The appellants were convicted upon two counts of each indictment. The first indictment was numbered 6354. The third count of that indictment, upon which the appellants were convicted, charged them with wilfully, unlawfully and feloniously removing the ballots which were cast in San Joaquin County at the general

election of 1934, from the custody of the county clerk of that county contrary to the provisions of section 1265 of the Political Code. The fourth count of that indictment upon which they were also convicted charged them with a conspiracy to commit the same crime contrary to the provisions of section 182 of the Penal Code. The second indictment was numbered 6376. It contained two counts upon both of which the appellants were convicted. The first count of the second indictment charges the appellants with wilfully, unlawfully and feloniously altering the ballots after they were voted and cast in San Joaquin County at the general election which was held November 6, 1934, contrary to the provisions of section 45 of the Penal Code. The second count of that indictment upon which they were also convicted charged them with a conspiracy to commit the same offense.

The causes upon the two indictments were consolidated for the purpose of trial. The appellants demurred and moved to quash the indictments which were denied. Their motion for a new trial was also denied. From the judgments of conviction and orders this appeal was perfected.

It is contended the indictments fail to state public offenses under the election laws of California, chiefly because section 1265 of the Political Code does not designate the prohibited removal of ballots from the custody of the county clerk as a felony or misdemeanor and it fails to impose a penalty therefor. It is also asserted the judgment of conviction is not supported by the evidence, particularly as to the appellant Williams; that the *corpus delicti* was not properly established; that the record contains no sufficient proof of facts tending to connect the appellants with the crimes charged so as to adequately corroborate the testimony of the accomplice, Melton, as required by section 1111 of the Penal Code; that the court erred in receiving and rejecting testimony at the trial of the case, and in giving to the jury and refusing certain instructions, and that the district attorney was guilty of prejudicial misconduct in the trial of the case and in his argument to the jury.

For many years William H. Riecks and Harvey M. Odell, have been rival candidates for sheriff of San Joaquin County. In 1934 Odell was the incumbent of that office. Riecks was formerly sheriff of that county. Both appellants had been deputies in his office and were very active in behalf

of his candidacy against Odell for the office of sheriff and coroner of that county during the general election which was held in November, 1934. They were in hopes of again becoming deputies in the event of his election. Kennedy was a prominent broker who resided in Stockton. Williams formerly lived at Stockton, but for some time prior to the election he had been living in Oakland. Harvey M. Odell and William H. Riecks were opposing candidates for sheriff and coroner of San Joaquin County at the fall election which occurred November 6, 1934. The appellants were campaign managers of Riecks in his candidacy and were actively engaged in attempting to procure again his election to that office.

In a building located directly across the street from the courthouse, the county clerk maintained a registration bureau during the election period. After the election the packages of ballots were placed by the county clerk in the basement of that building which was kept locked. C. C. Melton was employed by the sheriff as night watchman of that building during the election and until November 19th, when he was discharged. He possessed a key to the building and had access to the basement where the ballots were kept in the custody of the county clerk. Adjacent to this registration building there was a vacant three-story building, which was rented by the defendant, Kennedy, and used as the headquarters of Riecks during the campaign and until some three weeks thereafter. This building also had a basement. The basements of the two adjoining buildings were separated by a brick wall. Both basements were accessible by means of inside stairways leading thereto. There was a hole 8½ by 11 inches in size through the brick wall which separated the two basements. This hole was located about five feet above the floor of the basements.

San Joaquin County is divided into 228 precincts. According to returns from the various election boards, 33,877 votes were cast in 1934 for Odell and Riecks for sheriff and coroner of the county. Odell was given a majority of these ballots in the aggregate number of 322 votes. Many voted ballots in each precinct contained no stamp opposite the name of either candidate for sheriff. The voted and spoiled ballots were separately strung on cords, enclosed in packages sealed with wax pursuant to law, returned to the county

clerk and stored by him in the basement of the registration building pending the official count thereof. Kennedy and Williams arranged with the defendant Melton, the night watchman in charge of the registration building, in consideration of a promise to pay him $500, to pass the packages of voted ballots to them through the hole in the basement wall. This was done in the nighttime between the dates of November 12th and November 19th. For several nights they worked in that manner from 9 o'clock to 2 or 3 o'clock in the morning. They confined their alteration of ballots to 31 precincts. By means of these fraudulent changes in the ballots it was made to appear that Riecks gained on an average of approximately 17 votes in each of the 31 precincts above the official returns of the election boards. The defendants took the precaution to wear gloves to avoid the impression of fingerprints on the ballots and envelopes which they handled. They obtained package sealing wax in Oakland to avoid evidence of tracing its purchase to Stockton. This wax was used to reseal the packages. During their operations the ground floor of the Riecks headquarters was kept in darkness. The appellants worked in the basement of their building by means of candle-light. The appellants evidently found 511 ballots in the 31 precincts which they examined, which contained no choice for the office of sheriff, upon each of which they stamped a cross opposite the name of Riecks. These packages were then resealed by flowing wax over the broken seals of the envelopes and they then returned the packages to Melton through the hole in the wall. Melton replaced them in the basement of the registration building. By means of these changes it was made to appear that Riecks had obtained a majority of 189 votes over his opponent. Riecks then commenced a contest of election against Odell, which was filed December 18, 1934. The appellants were extremely active in the prosecution of that case.

Upon the trial of the election contest the fraudulent change of the ballots was disclosed and the court determined that Harvey M. Odell was duly elected sheriff and coroner of San Joaquin County.

Subsequently the three defendants were jointly indicted as previously stated. Upon the first hearing before the grand jury Melton denied that he had any knowledge of tampering with the ballots. Upon a later hearing, however, he made

a confession of the entire transaction, implicating therein the appellants. Melton pleaded guilty and was sentenced to imprisonment in San Quentin. The appellants moved to quash the indictments, and also demurred to each of them. The motion was denied and the demurrers were overruled. Hearings upon the two indictments were consolidated for the purpose of trial. The appellants were convicted upon two counts of each indictment. Motions in arrest of the judgments and for a new trial were denied. From the judgments of conviction and the orders this appeal was perfected.

We are of the opinion that each of the counts of both indictments under which the appellants were convicted states sufficient facts constituting public offenses against the election laws of California in ordinary and concise language readily understandable by a person of common intelligence, and that the indictments fully comply with the requirements of sections 950, 951 and 952 of the Penal Code. The third count of the first indictment clearly charges the appellants with the removal of the election ballots from the custody of the county clerk contrary to the provisions of section 1265 of the Political Code. The first count of the second indictment clearly charges them with altering the ballots which were cast at that election contrary to the provisions of section 45 of the Penal Code, which is specifically declared to be a felony. The other two counts upon which they were convicted clearly charge them with conspiracies to commit these designated crimes. In the conspiracy counts they were specifically charged with the performance of definite overt acts as required by section 1104 of the Penal Code, consisting of removing the packages of ballots from the custody of the county clerk as alleged in the first indictment, and of altering the ballots after they were cast at the general election as alleged in the second indictment.

Section 1265 of the Political Code, as amended by the Statutes of 1933, at page 607, provides that "The package containing the voted ballots shall be kept by the county clerk . . . *unopened and unaltered,* for six months subsequent to the date of the declaration of the result of the election", and that *"in no event shall the said package or its contents be taken from the custody of the county clerk"*. This section of the Political Code does not specifically declare that the violation of its provisions shall constitute a crime, nor does

it fix a penalty therefor. Section 61 of the Penal Code, however, provides that:

"Every person who wilfully violates *any of the provisions of the laws of this state relating to the elections* is, unless a different punishment for such violation is prescribed by this code, punishable by fine not exceeding one thousand dollars, or by imprisonment in the state prison not exceeding five years, or by both."

Section 1265 of the Political Code and section 61 of the Penal Code should be construed together in determining the character of the offense and the penalty prescribed for its violation. (*Ex parte Stephen,* 114 Cal. 278 [46 Pac. 86].) Since the penalty for the violation of section 1265 of the Political Code, under the provisions of section 61 of the Penal Code, may result in imprisonment in the state prison, it will be deemed to be a felony and not a mere misdemeanor. (*In re Rogers,* 20 Cal. App. (2d) 397 [66 Pac. (2d) 1237].) When the statute makes an act unlawful or imposes a punishment for its commission, this is sufficient to constitute the act a crime without any express declaration to that effect. (16 C. J. 68, sec. 29.) It is true that a statute may be held to be void for uncertainty when it fails to adequately describe the prohibited act. (16 C. J. 67, sec. 28.) It is, however, said in the text last cited: "Reasonable certainty, in view of the conditions, is all that is required, and liberal effect is always to be given to the legislative intent when possible." In the present case the purpose of the legislature in penalizing the wilful violation of the election laws of the state, including the removal of the ballots from the custody of the county clerk or their alteration is to preserve the integrity of public elections so as to accomplish the will of the voters.

The judgments of conviction of the various counts of both indictments, which were rendered pursuant to the verdict of the jury, are adequately supported by the evidene. ▉ It is contended that the record fails to prove the *corpus delicti* independently of the testimony of Melton, the accomplice, as required by the provisions of section 1111 of the Penal Code, and that without resorting to his testimony there is no substantial evidence, as required by section 1104 of the Penal Code, to prove that the appellants were guilty of any overt acts charged in the indictments such as the removal of the ballots from the custody of the county clerk, or the

actual changing of those ballots. We are of the opinion there is no merit in these contentions.

The *corpus delicti* is shown by comparison of the returns of the various election boards with the result of the recount of ballots upon the contest of election, without considering the testimony of Melton. The record conclusively shows that someone tampered with the ballots and altered them after they had been cast and counted by the election boards. From the official returns of these election boards it appears that Riecks received in the 31 precincts particularly involved in this case 511 votes less than the ballots subsequently indicated in his behalf. This shows a gain of an average of about 17 ballots in each of these challenged precincts. As compared with normal changes which occurred on account of errors in the remaining 197 precincts which were not tampered with, reasonably considering every possible error which might have occurred in the returns of the election boards, the startling increase of 511 votes in favor of Riecks in those 31 precincts leaves no doubt of the fact that someone committed the crime of fraudulently removing and altering the ballots after they were cast, counted by the election boards and returned in the packages to the custody of the county clerk as required by law. The record contains much more evidence in proof of the commission of the crime of fraudulently altering the election ballots, independently of the confession of the accomplice, Melton. For instance, several election officers testified to their personal recollection of specific ballots in their particular precincts which contained "single shot" crosses after the name of only a candidate for governor, which ballots appeared on the recount in the contest of election with additional crosses following the name of Riecks; on some of these ballots the impression of the crosses opposite the candidate for governor and for other candidates appeared to be very dim, while the stamp opposite the name of Riecks was comparatively and noticeably heavy, leaving conspicuous offsets of ink from the cross on the opposite side of the folded ballot. Also, certain election officers testified that they enclosed the ballots of their respective precincts in envelopes which they personally sealed with wax pressed down with either a finger or a silver coin so as to clearly show those distinguishing marks in the wax. It appears from an inspection of the ballot envelopes that other

sealing wax had been subsequently flowed over those hardened seals, leaving a portion of the fingerprints or impressions of coins exposed. Moreover, a quantity of cigaret stubs, discarded cigaret folders, blotches of tallow grease, sealing wax and a portion of one of the election ballot envelopes were found in the basement of the Riecks headquarters opposite the hole in the wall which connected the two basements. These and other circumstances furnish adequate proof of the *corpus delicti,* independently of the testimony of the accomplice.

The evidence strongly tends to connect the appellants with the crimes of which they were convicted, independently of the confession of the accomplice, Melton. It is true that such evidence is insufficient to comply with the requirements of section 1111 of the Penal Code, if it merely raises a suspicion of their guilt. Corroborating evidence tending to connect the accused with the commission of the offense with which he is charged may consist of either facts or circumstances which, standing alone, may be insufficient to prove his guilt and which unsupported may be inconclusive, yet if when fairly considered it reasonably tends to implicate the accused in the commission of the offense it sufficiently complies with the requirements of section 1111 of the Penal Code. (*People* v. *Barker,* 114 Cal. 617 [46 Pac. 601] ; *People* v. *Yeager,* 194 Cal. 452 [229 Pac. 40] ; *People* v. *Norris,* 133 Cal. App. 606 [24 Pac. (2d) 561] ; 8 Cal. Jur. 178, secs. 256, 257.) The syllabus in the Barker case, *supra,* correctly states the declaration of the Supreme Court regarding that subject as follows :

"Evidence tending, independently of that of the accomplice, to connect defendant with the commission of the offense is all that is required, even though if it stood alone it would be entitled to but little weight; nor need it extend to every fact and detail covered by the statements of the accomplice."

 In the present case, independently of the testimony of the accomplice, the evidence shows that both appellants were deputies of Riecks when he was formerly sheriff of San Joaquin County; they were both exceedingly active in his campaign for sheriff in 1934; they rented the Riecks headquarters adjacent to the county clerk's registration building where the ballots were subsequently stored; they were active in behalf of the election of Riecks in and about

that building and in the city of Stockton; they personally interested themselves in the contest of election; the possession of the Riecks headquarters and of the keys to that building were retained by them for more than two weeks after the election during which time the ballots were evidently tampered with; they were seen at least on one occasion at the Riecks headquarters in the nighttime several days after the election.

On February 18th, while the trial of the election contest was in progress, Mr. Melton received an anonymous letter warning him that his connection with the fraudulent altering of ballots was known and saying that "the big shots" would get out from under and let him "take the jolt" if he was not careful, or language to that effect. It does not appear who wrote that letter. It was evidently forwarded to entrap the persons who were presumed to have participated in the election fraud. It had the desired effect. Melton promptly went to the office of the appellant Kennedy, where he also found his attorney, Mr. Delucchi. He told them of the receipt of the letter and related its contents from memory. Mr. Kennedy told him that if he got into any trouble over the matter that Mr. Delucchi would represent him. On the night of February 23d, Kennedy called for the letter at the home of Melton, where he also found Melton's wife and young daughter. The letter was discussed in their presence. Finally it was handed to Kennedy. Mrs. Melton had gone to the kitchen. After she left, when Kennedy was about to depart with the letter in his possession, he said to Melton, within the hearing of the child, "Lay low, say nothing, and keep out of this." The daughter testified to that fact at the trial. This incident tends to show that Kennedy was vitally interested in the altering of the ballots and tends to prove that he was connected with the commission of the offense sufficiently to meet the requirements of section 1111 of the Penal Code.

Although Williams lived in Oakland, he spent his time in Stockton during the election period until after November 19th and actively engaged in the campaign to help elect Riecks as sheriff and coroner of San Joaquin County; he associated with Kennedy and he interested himself in the election contest; he remained in Stockton some time after the election with no better excuse than that he was engaged in

coaching a candidate for admission to a lodge; he swept out the Riecks headquarters about November 19th after the alteration of the ballots was presumed to have been completed; although the necessity for the use of lights in the headquarters building after the election was not accounted for; the control of the building was retained and the meters showed the consumption of a considerable quantity of electricity during the period of time in which the possession of the building was retained by Riecks after the election had passed; although Williams denied that he purchased sealing wax in Oakland, Mr. Moore, the proprietor of an art store in that city, testified that Williams bought of him at his store in Oakland, on two different occasions between the 12th and 19th of November, 1934, red wax, which he said he wanted for sealing packages, and that he preferred small sticks which he could easily carry in his pocket. In spite of the fact that Moore had never previously known Mr. Williams, he readily identified him in open court as the person who purchased the wax from him in Oakland. These circumstances, together with others shown by the record, the attitude and conduct of the appellants and various statements made by them which were refuted by other witnesses furnish ample evidence to corroborate the testimony given by Melton implicating them in the crimes, to satisfy the requirements of the law.

Melton's statements conform in every material detail to the physical facts which are involved in the case and with the reasonable probabilities necessarily implied by all of the circumstances of the transaction. He testified that the appellants hired him with a promise to pay $500 for his services, $180 of which was actually paid, to take the packages of ballots from the custody of the county clerk in the basement of the registration building and pass them through the hole in the wall which separates the two basements; that he actually did so assist them on the nights of November 12th to the 19th, sometimes working in that manner from 9 o'clock at night to 1 or 2 o'clock in the morning; that he usually handed the packages to Kennedy whom he observed through the hole in the wall working with them on a bench for an average period of about twenty minutes with each precinct, after which they were resealed and returned to Melton through the same hole; that on one occasion he handed

Williams, whom he distinctly recognized, a package and Williams then said "wait a minute and Clarence [Kennedy] will return". He also said they worked with gloves to prevent the disclosure of fingerprints on the envelopes or ballots. The subsequent presence of cigaret stubs, cigaret package wrappers, candle grease, wax spots and a torn piece of ballot envelope paper in the basement of the Riecks headquarters opposite the hole in the wall strongly corroborates the story of Melton. A careful reading of the record leaves very little doubt of the guilt of the appellants. The evidence is entirely satisfactory.

The appellants have assigned errors on the part of the court in receiving and rejecting certain evidence with relation to six different subjects. We have examined these assignments and find no reversible error in any of them.

■ The examination of the appellant Williams with relation to his activities in Stockton after the election until about November 19th, and regarding the reason he did not promptly return to his home in Oakland was not unduly restricted. He testified definitely that he remained in Stockton during that period of time to coach a candidate for admission to a lodge, and that he attended that lodge and remained there until about 11 o'clock the night of November 12th, when Melton said he saw him in the basement of the Riecks headquarters. Williams was permitted to testify that according to the custom of the lodge he was appoined to coach a candidate for admission, who was a friend of his, and that he remained in Stockton after the election for that purpose. We are unable to see how the exclusion of further details regarding the custom of the lodge, or his own personal activities in that regard was prejudicial to this appellant. The scope of his examination was not unduly limited. ·

■ With regard to the second assignment of error of that nature, it appears that the witness Delucchi, who was an attorney for Mr. Riecks in the election contest case, did testify that the reason they failed to call Melton as a witness in that proceeding was that they considered him flighty and unreliable. The excluded evidence on that subject merely consisted of further elaboration of the same reason for not calling him as a witness. It does not appear that the appellants were prejudiced thereby.

■ The third assignment of this character charges error in striking from the record a part of the testimony of Dr. Frost. To rebut the statement made by Melton that he had seen Williams in the basement of the Riecks building on certain nights, Mr. Williams testified that he was sick and confined to his room on November 15th and 16th, and was then required to consult Dr. Frost on that account. The doctor merely testified that Williams had a wrenched knee which he treated *in October,* and that he did not thereafter treat him for any ailment until the latter part of November. His evidence threw no light on the question as to whether Williams was confined to his room on November 15th and 16th. It was immaterial. It was properly stricken from the record.

■ The fourth assignment charges error in restricting the cross-examination of Melton regarding his original statements before the grand jury, for the purpose of impeaching him. Melton had freely admitted in the presence of the jury that his first statements to the grand jury were false. The attorneys for the prosecution also conceded that they were false. He was thereby impeached by his own admission. Further cross-examination upon that subject would accomplish no useful purpose. Regarding the truthfulness of his story of the transaction in which he subsequently implicated the appellants in the fraudulent alteration of the ballots, he was cross-examined upon every essential detail without limitation. The excluded evidence was incompetent for the purpose of impeachment. (*Albert* v. *McKay & Co.,* 174 Cal. 451 [163 Pac. 666]; 28 R. C. L. 639, sec. 224; *Bennett* v. *Robertson,* 107 Vt. 202 [177 Atl. 625]; 98 A. L. R. 152, note.) In 28 Ruling Case Law, at page 639, it is said:

"If the witness admits that he made the contradictory statements, there is no necessity for proving them, and they are, therefore, not admissible in evidence."

In 6 Jones' Commentaries on Evidence, second edition, 4742, section 2405, it is said in that regard:

"If . . . such admission is unequivocal and free from qualification, other evidence to show such statements or conduct is not admissible. The party seeking to impeach having proved the fact relied upon for impeachment by the witness' own mouth, there is no occasion to permit the proceeding to go further."

The fifth assignment also involves the exclusion of evidence on the examination of Melton with relation to intricate details of the transaction of altering the ballots, which was sought to be elicited *for the purpose of laying a foundation* to impeach him. The witness was elaborately examined in that regard. His examination was not unduly restricted. Moreover, a more complete laying of a foundation to impeach the witness was unnecessary. The foundation was conceded. The impeaching evidence was received, and the witness freely admitted that he testified falsely before the grand jury at the first hearing of the investigation. There was no error in this ruling of the court.

The last assignment of error of this nature involved the reading of certain portions of the transcript of evidence of the witness Melton, which was taken before the grand jury at the last hearing thereof. The defense had previously sought to impeach the evidence which Melton gave on that occasion, for it implicated the appellants in the entire fraudulent scheme of altering the ballots. For the purpose of rebutting any evidence which was intended to impeach him on that occasion, it was proper for the court to permit the attention of the witness to be called to particular portions of the transcript of testimony so as to give him the opportunity of explaining the apparent inconsistency therewith. That procedure was not erroneous. (*People* v. *Ferdinand,* 194 Cal. 555, 562 [229 Pac. 341].)

It does not appear that appellants were prejudiced by the fact that three of the jurors who sat in the trial of this case served as precinct officers in San Joaquin County in the general election which was held on November 6, 1934. Not any of these three jurors served in any of the 31 precincts in which it was claimed the ballots were fraudulently altered. The district attorney did stipulate at the trial that all prospective jurors who had served on election boards in any of these 31 precincts might be excused from serving. Each of the three jurors who served as election officers in their respective precincts at the election was examined upon his *voir dire* and freely stated that he had served as a precinct officer in his respective precinct at the election. No objection to any of these jurors on that account or otherwise was offered by the appellants. The peremptory challenges allowed the appellants by the terms of section 1070 of the Penal

Code were not exhausted. Under such circumstances it is too late to complain for the first time on appeal of the fact that these jurors were accepted, in the absence of a showing that the appellants were prejudiced thereby. (*People* v. *Estorga,* 206 Cal. 81 [273 Pac. 575]; *People* v. *Tyren,* 179 Cal. 575 [178 Pac. 132]; *People* v. *Winthrop,* 118 Cal. 85 [50 Pac. 390]; *People* v. *Edenburg,* 88 Cal. App. 558 [263 Pac. 857]; 8 Cal. Jur. 609.)

 The court properly gave to the jury at the request of the prosecution, the following instruction:

"If any witness examined before you has wilfully sworn falsely to any material fact, it is your duty to distrust his entire testimony."

This is a correct statement of the law. This very instruction has been repeatedly approved by our Supreme Court. (*People* v. *Plyer,* 121 Cal. 160 [53 Pac. 553].) Moreover, it is a mere statement of a commonplace rule which would naturally govern all reasonable and conscientious jurors in attempting to weigh the probative value of evidence. (*Reynolds* v. *E. Clemens Horst Co.,* 35 Cal. App. 711, 719 [170 Pac. 1082]; *People* v. *Hansen,* 130 Cal. App. 217, 221 [19 Pac. (2d) 993]; *People* v. *Tibbs,* 143 Cal. 100 [76 Pac. 904].) It has been held that neither the giving nor the refusing of such commonplace principles applicable to the weighing of evidence by juries will warrant the reversal of a judgment which is otherwise valid. (*People* v. *Hewitt,* 78 Cal. App. 426 [248 Pac. 1021]; *People* v. *Hansen, supra; Hirshfeld* v. *Dana,* 193 Cal. 142 [223 Pac. 451].) It will be observed the jury was not instructed that it must *disregard or reject* the entire evidence of a witness who has wilfully sworn falsely to a material fact. It is merely told that when a witness has deliberately perjured himself regarding a material fact in the case, it is the duty of the jury to *distrust* the balance of his testimony. This merely means what any person of common judgment would know without judicial instruction, that it is the part of wisdom and a duty on the part of jurors to carefully scrutinize with distrust or suspicion the entire testimony of a witness who has wilfully perjured himself regarding a material fact in the case. This rule still permits a juror to accept other testimony of a witness who has wilfully sworn falsely regarding a material fact, if, in spite of merited suspicion on the part of the juror, he still be-

lieves the balance of the testimony to be true. It was not reversible error to have given the foregoing challenged instruction.

Nor was it error for the court to refuse to give the following instruction which was offered by the appellants, to wit: ''You are further instructed that a witness false in one part of his testimony is to be distrusted in others.''

Without resorting to ultra-refined distinctions, this proposed instruction means substantially the same as the preceding one which was given to the jury, of which the appellants complain. Their offer of this instruction furnishes another reason why they may not complain of the giving of the former one. This rejected instruction does fail to state that the false evidence which will require the jury to distrust the balance of the witness' testimony must be wilfully given and it must also be upon a material fact involved in the case. But assuming, without so deciding, that the latter instruction correctly states the law, it was covered by the former one which was given to the jury, and the appellants may therefore not complain.

The court properly instructed the jury that ''In this case the evidence shows that the witness Melton is a self-confessed accomplice,'' and then proceeded to charge in the language of section 1111 of the Penal Code that the appellants therefore could not be convicted upon his testimony alone unless it was corroborated by other evidence which tended to connect them with the commission of the offense. In fact, the appellants offered an instruction substantially covering the same principle of law, and they may therefore not complain of the giving of this one. They now assert that this instruction was prejudicial to them because it infers that they were also accessories to the same crime of which the court instructs the jury that Melton admitted he was an accomplice. We do not think the instruction is reasonably susceptible of that construction. The court does not say Melton was an accomplice. It states that the evidence shows that he is a ''self-confessed'' accomplice. That merely means that the witness admitted that he was an accomplice. In fact, the entire case was tried by all parties on the theory that Melton was an accomplice. An accomplice as defined by section 1111 of the Penal Code is merely,

"One who is liable to prosecution for the identical offense charged against the defendant on trial in the cause in which the testimony of the accomplice is given."

An accomplice is one who participates in the commission of the offense with which the defendants are charged. He does not necessarily participate *with the defendants* in the commission of the offense. The term "accessory" refers to the crime involved in the investigation rather than to the particular parties who participate therein. The reference to a confessed accessory does not even intimate that the persons with whom he claims to have been associated were therefore also guilty of the crime. There is no merit in the contention that the last-mentioned instruction amounted to a charge that the appellants were necessarily guilty of the same offense. The instruction regarding the testimony of Melton, as an accessory, was favorable to the appellants. It merely classified him in the category of an accessory so as to warn the jury that the appellants could not be convicted upon his uncorroborated evidence. This was for the protection of the appellants. It was properly given. (*People* v. *Southwell*, 28 Cal. App. 430 [152 Pac. 939].)

On the appellants' motion for a new trial it was contended the verdict of guilty of the offenses as charged was procured by the prejudice, fear and misconduct of the jurors. Affidavits in support of that motion were filed in which two or more jurors averred that certain jurors had said in the presence of the other jurors in the course of their deliberations on the evidence adduced at the trial that "anyone who held out for acquittal would be accused of having been bought and would not be able to face the public". The affidavit of another juror avers that one of the jurors also said during their deliberations that he was a neighbor of the candidate for sheriff, Mr. Riecks, and that he knew he was about to lose his house by foreclosure. It is not averred that the foregoing statements influenced any juror to vote for the conviction of the appellants who would not have otherwise done so. Moreover, these affidavits of the jurors were not competent to impeach their verdict. It is a well-established principle of law that a juror may not thus impeach his verdict after it has been duly rendered and filed. (*People* v. *Findley*, 132 Cal. 301 [64 Pac. 472]; *People* v. *Kloss*, 115 Cal. 567 [47 Pac. 459]; *People* v. *Azoff*, 105 Cal. 632 [39

Pac. 59] ; 20 Cal. Jur. 61, sec. 41; 24 Cal. Jur. 877, sec. 126.)

Finally, the appellants have assigned as prejudicial misconduct on the part of the district attorney and his deputy numerous statements made by them in their arguments to the jury which it is contended were not in accordance with the evidence. Many assignments of prejudicial statements have been made to which objections were not taken at the trial. In the interest of brevity we shall not review the assignments to which no exceptions were taken at the trial, although we have carefully examined each of them and believe there is a satisfactory answer to each assignment under the circumstances of this case. Many of these assignments are trivial. Ordinarily an appellate court will not consider an assignment of prejudicial misconduct of a district attorney in his argument to a jury, unless an objection to his statement is made at the time. (*People* v. *Fleming,* 166 Cal. 357 [136 Pac. 291, Ann. Cas. 1915B, 881] ; *People* v. *Steelik,* 187 Cal. 361, 377 [203 Pac. 78] ; *People* v. *Harris,* 219 Cal. 727 [28 Pac. (2d) 906].) To seven statements made by the district attorney and his deputy in the course of their arguments to the jury, the appellants did object in every instance on the ground that the record contains no evidence to support them. It must be conceded the attorneys for the state did exceed the bounds of propriety in their zeal to perform their duty. They did depart from the record on several occasions. We do recommend moderation, caution and decorum on the part of counsel on both sides of all court proceedings. In no other way may we preserve the dignity and respect of our courts.

In mitigation of the errors complained of it should be recalled that this case attracted unusual public interest in that community because it involved the right of tenure to an important county office, and the integrity of the election laws. The case was hotly contested. The trial lasted over two months. The testimony consists of over 3,500 pages. The arguments consumed five days of time and consist of more than 500 pages. An attorney may be pardoned for failure to accurately recollect all of the evidence in such an extensive record. The appellants were represented at the trial by a very able, aggressive and resourceful lawyer. And yet he pointed out only seven statements of adverse counsel which he claimed constituted departures from the evidence. Several

of these are trivial matters which are apparently harmless. Two or three of the assignments are clear departures from the record. Yet we are of the opinion they do not constitute reversible error under the circumstances of this case. We are of the opinion the jury was not prejudiced or deceived by any of them. To review each of these challenged statements in detail would unduly extend this opinion. We shall, therefore, not attempt to do so in view of the fact that we are satisfied this cause did not result in a miscarriage of justice.

The appellants did not ask the court to instruct the jury to disregard any of the statements to which they objected, yet the judge twice voluntarily instructed the jury as follows: "The court will instruct the jury the statements of counsel constitute no evidence in the case, and should not be considered by you as such." Moreover, in the final charge to the jury, the court further instructed it that,

"You are only to consider the evidence admitted by the court and allowed to remain. The statements of counsel are not evidence, and you are not to consider such statements as evidence in your deliberations respecting a verdict. Nor are you to consider as evidence any statements made by the court to counsel in ruling on the admissibility of testimony."

We must assume that the jurors followed these instructions, and that they refrained from considering any of the facts which were assigned as misstatements of evidence.

The rule of law is supported by a multitude of California authorities to the effect that ordinarily an assignment of error in the misstatement of facts in evidence in the course of an argument to the jury is cured by the direction of the court to disregard it. (3 Am. Jur. 614, sec. 1076; 8 Cal. Jur. 623, sec. 603; *People* v. *Burkhart*, 211 Cal. 726, 733 [297 Pac. 11]; *People* v. *Craig*, 196 Cal. 19 [235 Pac. 721].)

The case of *People* v. *Pantages*, 212 Cal. 237 [297 Pac. 890], upon which the appellants rely upon this point, is not authority for reversing a judgment of conviction under the circumstances of this case. The Pantages case was not reversed on the alleged prejudicial misconduct of the district attorney alone. At page 278 the court said in that case:

"While it is our conclusion that this judgment must be reversed, we feel bound to state that the instances of misconduct of the district attorney hereinbefore set forth would not, standing alone, necessarily require such a result. The other

errors, however, were in our opinion vitally prejudicial, and considered together with the misconduct complained of, warrant the conclusion that the defendant was not unlawfully convicted.''

In the present case several of the assignments of misconduct fall within the well-known rule that counsel may argue any facts or theory reasonably included within the natural inferences which may be drawn from the evidence adduced. (*People* v. *Hall,* 94 Cal. 595 [30 Pac. 7]; 3 Am. Jur. 614, sec. 1073; *People* v. *Willard,* 150 Cal. 543 [89 Pac. 124].) The assignment with regard to a failure on the part of the prosecution to place one Huntington on the witness-stand, in which it was merely stated that a subpoena had been issued for him, was invited by the challenge of appellants' attorney as follows: ''Where is Huntington? *Write that down Mr. Clowdsley and tell us about it.''* The reference to the subpoena is harmless. It was invited and is therefore not prejudicial misconduct. The statement that Melton did not confess until he was persuaded to do so by ''these two splendid men . . . in the State Bureau of Investigation'' was not objectionable on the ground that their identity was not disclosed. The record shows that Melton testified he was arrested by ''Mr. Kessel and Mr. Hickock, State men from Sacramento''. Counsel for the defense also assumed the same thing. He asked Melton ''Q. That man you referred to is connected with the State Board of Identification? A. . . . I know he is a State man.'' It was not misconduct for the deputy district attorney after pointing out the fact that Odell received a majority vote of 324 as reported by the election boards, to say:

''Did you ever hear . . . of a recount being brought where there were that many differences between the candidates? . . . Why spend $1200 attempting to overcome that (majority) . . . Do you think it is reasonable to believe they would have invested that money in the recount proceedings if they had not known at that time *they were playing with a stacked deck of cards?''*

This was an extravagant statement, but it was not misconduct. It may not be said that it was an unwarranted inference to be drawn from the evidence. Nor was it misconduct for the assistant district attorney in referring to the testimony of Mr. Riecks and his attorney discrediting and

impeaching the accessory, Melton, to say, "It is somewhat like the teakettle calling the pot black." That statement merely meant it was unbecoming for such interested witnesses to testify to the bad character of Melton. It was conceded Melton's character was bad, and that he had been impeached. The record does not appear to warrant the statement that Melton was not the "black devil" he has been painted, and added, "He had never been in jail before this occasion." Evidently the deputy honestly believed the evidence so showed. This statement was harmless. The witness had confessed his participation in these crimes. He was thoroughly impeached. It could not have prejudiced the jury, even if he had previously been in jail.

We are therefore of the opinion the assignments of prejudicial misconduct do not constitute reversible error. Numerous citations of authorities support the text which is found in 8 California Jurisprudence, section 602, as follows:

"Courts are strongly inclined against setting aside convictions upon the ground of misconduct of district attorneys alone. Such misconduct, therefore, is not ground for a reversal when it is unimportant or slight, or when it cannot prejudice the defendant, or when it appears that the verdict would not have been controlled or affected by it, as where the evidence is such that it is inconceivable that any honest jury could have found any other verdict in the absence of any dereliction on the part of the district attorney. A judgment will not be reversed because of the misconduct of the district attorney *except in clear, and extreme cases,* and unless the misconduct is flagrant and obviously prejudicial, and unless, in the opinion of the appellate court from a review of the entire record, it results in a miscarriage of justice."

We are convinced the present case did not result in a miscarriage of justice.

The judgment and the orders are affirmed.

Pullen, P. J., and Plummer, J., concurred.

A petition for a rehearing of this cause was denied by the District Court of Appeal on June 11, 1937, and an application by appellants to have the cause heard in the Supreme Court, after judgment in the District Court of Appeal, was denied by the Supreme Court on June 25, 1937.