KAUFMAN, P. J.
 

 Appellant was charged by indictment with two counts of violation of section 11500 of the Health and Safety Code: (1) unlawfully offering to sell marijuana; (2) the unlawful possession of marijuana, A jury found him guilty of the first count but not guilty on the second count. On appeal, he contends that the court erred in its instructions to the jury relating to the elements of the offense of unlawfully offering to sell narcotics and that section 11500 of the Health and Safety Code as it relates to an offer to sell narcotics is void for vagueness and, hence, unconstitutional.
 

 There is no dispute about the facts of the transaction. On
 
 *248
 
 February 11, 1958, Officer Balmy of the San Francisco Police Department, operating in an undercover capacity as Phil Cardo, was introduced to the appellant as “Johnnie” by one Douglas Ferguson. The appellant asked Mr. Balmy if he had the man with the $5,000 that Mr. Ferguson had mentioned. Officer Balmy answered in the affirmative and the appellant said: “Maybe we can work out a deal.” The officer then asked, “What type of a deal?” and they discussed the profit and price that the officer’s man would pay per pound for marijuana.
 

 The appellant stated he thought he could arrange for a sale of 65 pounds of marijuana for $5,000 but that he first wanted to meet the officer’s man to make sure he was all right and could be trusted. The following evening [February 12], Officer Balmy met the appellant at Ferguson’s apartment. They again discussed their individual profits from the transaction and then left the apartment and drove to the Surf Motel to meet the officer’s man.
 

 The appellant and Mr. Balmy entered a motel room where Inspector Kerrigan of the San Francisco Police Department was introduced to the appellant as Jack Gross. Claire Lutz, a policewoman who posed as the inspector’s girl friend, was also present. The inspector said to the appellant: “Phil has been telling me that you could produce some ‘weed.’ ” The appellant replied: “Yes, that I could, but I wanted to meet you and check you out.” They then discussed the price and appellant appeared satisfied with the answers of the inspector and asked to see the money. The inspector left the room and returned a few minutes later with an envelope saying, “Here it is.” The appellant asked, “Is that $5,000?” The inspector answered, “Yes, there’s $5,000 here.” Then appellant expressed some doubt. The inspector handed the envelope to appellant who thumbed through the bundle of money and said, “I guess it’s all here.” The appellant then stated, “Well, I guess we can make a deal. I can go make a phone call now and get things rolling. ’ ’
 

 The appellant and Officer Balmy left the motel room and walked to a nearby gas station where the appellant made a telephone call. Officer Balmy saw the appellant make the telephone call, but did not hear the conversation. After finishing the call, the appellant emerged from the phone booth saying: “Well, I guess we’ve got a deal.” They both returned to the motel room. The appellant told Inspector Kerrigan that he had talked to his “connection” in Los Angeles and
 
 *249
 
 there seemed to be some doubt whether he could arrange for 65 pounds and asked if the inspector would take less. The inspector said that he had been promised 65 pounds and was interested only in that quantity. The appellant stated this was a rather large order on such short notice but he could attempt to comply with it. Officer Balmy and appellant then left the premises.
 

 The following day [February 13], the appellant arrived at the motel and told the inspector that he had received a phone call from his Los Angeles “connection” and could order only 45 pounds for $3,500. The inspector accused appellant of trying to “burn him” but the appellant explained his contact did not have that much on hand and that the next day he would inform Officer Balmy when the sale would take place. The arrangements for the deal were made and appellant left the premises.
 

 The next day [February 14], the appellant met Officer Balmy at Ferguson’s apartment and told the officer his people were on the way and the deal should take place by 1 a. m. Officer Balmy left saying he would see the appellant over at Jack’s place. About 10:30 that evening, the appellant arrived at the motel and said, “Well, my people are here but we have to have the deal go down their way. ’ ’ Officer Balmy, Inspector Kerrigan and Miss Lutz were present. The appellant offered two plans as to how the sale should be consummated, both of which were rejected by the inspector. Then the inspector proposed the following scheme: The inspector would take his vehicle and park it in the parking lot adjoining the motel on the eastern side. Then the inspector would give the money to the appellant to count and seal in an envelope with scotch tape. The envelope was then to be handed to Kerrigan who would thereupon give the appellant the keys to Kerrigan’s car. The appellant would take the keys and get the marijuana, put it in the trunk of the inspector’s vehicle, and let Officer Balmy see the stuff, to make sure it was marijuana. When Officer Balmy was satisfied it was marijuana and that there was 45 pounds in the trunk, Balmy would signal Kerrigan through the window. Then the appellant was to return to the motel room with the key, and receive the envelope containing the $3,500 from Kerrigan.
 

 This plan was acceptable to the appellant and accordingly Inspector Kerrigan left the room and returned a few minutes later with the money. The inspector told the appellant to
 
 *250
 
 count the money while he moved his vehicle into the adjoining parking lot. Appellant did so, placed it in a white envelope, sealed it, put his initials on the flap, sealed the flap and put scotch tape over the flap. Then appellant handed the envelope co the inspector and received the keys to the trunk of the inspector’s car. The appellant and Officer Balmy left the room and walked to the front of the motel. The appellant told the officer to wait there while he crossed the street and met a Negro. Appellant and the Negro walked up and down the street for a while, then stopped, nodded their heads in an affirmative manner and started to walk into the parking lot. After taking two steps, the appellant looked sharply over his right shoulder, then took a few more steps, then turned around, walked to the curb and down the street. At the corner, the Negro kept going and appellant walked over to Officer Balmy and said, “Let’s get out of here. The man’s over there in the car.” [The word “man” refers to any law enforcement officer.] Officer. Balmy asked him if he was sure and the appellant replied, “Yes, I saw him laying on the floor of a car and I know it to be a police ear.” Then appellant said, “Let’s get up there and tell Jack,” and then they returned to the inspector’s motel room. The appellant said to the inspector, “The heat’s outside. You’d better get your broad and if you are dirty get clean and split.” The inspector replied, “Cool off. You got the bullhorrors.” Appellant insisted, “No, I don’t. I know that vehicle. I know it is a police car. The license plate is CHTJ566.” The car was in fact one of the cars assigned to the narcotics detail and was in the vicinity. The inspector agreed stating, “All right, it’s your town. You must know what you are talking about. Let’s get out of here.” The appellant and Officer Balmy left.
 

 Over a month later on April 4, 1958, Officer Balmy accompanied by Inspector Kerrigan and another officer went to the appellant’s apartment to arrest him. The officers knocked and the appellant opened the door. Inspector Kerrigan showed him his star and said, “You are under arrest.” The appellant looked at Officer Balmy and then asked the inspector, “What for?” The inspector answered, “Violation of the Narcotics Act.” The appellant replied, “I didn’t violate the Act. I didn’t sell you anything.” “No, but you offered to sell,” said the inspector. “That is not part of the law,” the appellant retorted, “. . . you would have gotten a turkey anyway. ’ ’
 

 The officers found a scale in the appellant’s kitchen. The appellant indicated he had bought the scale several months
 
 *251
 
 ago for the express purpose of weighing the inspector’s marijuana and it was not used for anything else. A search of the trunk of the appellant’s automobile revealed one marijuana seed. No marijuana was found on the appellant or in his apartment. At the trial, the appellant first stated that the various police officers correctly testified about the events of February 11-February 14. Appellant testified that he had no “connection” in Los Angeles and no way of obtaining any marijuana and that he had made the offer to sell under false pretenses.
 

 We will turn first to appellant’s argument that the statute is void for vagueness. Section 11500 of the Health and Safety Code provides:
 

 “Except as otherwise provided in this division, no person shall possess, transport, import into this State, sell, furnish, administer
 
 or
 
 give way, or
 
 offer to
 
 transport, import into this State,
 
 sell,
 
 furnish, administer, or give away, or attempt to import into this State or transport a narcotic except upon the written prescription of a physician, dentist, chiropodist, or veterinarian licensed to practice in this State.” (Formerly § 11160, Stats. 1939, ch. 60, p. 758, §11160, amended Stats. 1940, 1st Ex. Sess., ch. 9, p. 18; Stats. 1941, eh. 1116, p. 2820, § 5. Renumbered § 11500 and amended Stats. 1945, ch. 955, p. 1840, § 8, Stats. 1955, ch. 1466, p. 2675, § 1.) [Emphasis supplied.]
 

 The statute indicates that the possession or sale of a narcotic is a separate and distinct offense from an offer to sell or furnish narcotics. It is equally clear from the above that the Legislature intended to place its condemnation upon each distinct, separate part of every transaction coming within the mischiefs intended to be reached and remedied.
 
 (Cf. Burton
 
 v.
 
 United States,
 
 202 U.S. 344, 377 [26 S.Ct. 688, 50 L.Ed. 1057].) “. . . Anything which gives sustenance, solace, comfort or encouragement in the selling of narcotics or in the agreeing to sell narcotics, can be condemned, and properly so, by the Legislature ...”
 
 (People
 
 v.
 
 Shepard,
 
 169 Cal.App.2d 283, 288 [337 P.2d 214].)
 

 Appellant’s argument is that section 11500 of the Health and Safety Code insofar as it relates to the crime of unlawfully offering to sell narcotics is unconstitutional because the statute is void for vagueness. As pointed out in
 
 Lorenson
 
 v.
 
 Superior Court,
 
 35 Cal.2d 49, 60 [216 P.2d 859], in order for a statute to comply with constitutional requirements,
 
 *252
 
 ‘."...'.. it is not necessary that it furnish detailed plans and specifications of the acts or conduct prohibited.’
 
 (People
 
 v.
 
 Smith,
 
 36 Cal.App.2d Supp. 748, 752 [92 P.2d 1039].)
 

 “Although higher standards of certainty will be required of penal than of civil statutes
 
 {Levy Leasing Co.
 
 v.
 
 Siegel,
 
 258 U.S. 242 [42 S.Ct. 289, 66 L.Ed. 595]), a statute is sufficiently certain if it employs words of long usage or with a common law meaning, ‘notwithstanding an element of degree in the definition as to which estimates might differ.’
 
 {Connatty
 
 v.
 
 General Const. Co.,
 
 269 U.S. 385 [46 S.Ct. 126, 70 L.Ed. 322] ;
 
 International Harvester Co.
 
 v.
 
 Kentucky,
 
 234 U.S. 216 [34 S.Ct. 853, 58 L.Ed: 1284];
 
 Nash
 
 v.
 
 United States,
 
 229 U.S. 373 [33 S.Ct. 780, 57 L.Ed. 1232].) For example, the courts have upheld statutes employing such terms as: ‘to make diligent effort to find the owner’
 
 {Pacific Coast Hairy
 
 v.
 
 Police Court,
 
 214 Cal. 668 [8 P.2d 140, 80 A.L.R 1217]); ‘unreasonable speed’
 
 {Ex parte Daniels,
 
 183 Cal. 636 [192 P. 442, 21 A.L.B. 1172]); ‘unjustifiable physical pain or mental suffering’
 
 {People
 
 v.
 
 Curtiss,
 
 116 Cal.App.Supp. 771 [300 P. 801]); ‘practice law’
 
 {People
 
 v.
 
 Ring,
 
 26 Cal.App.2d Supp. 768 [70 P.2d 281]); and ‘to the annoyance of any other person’
 
 {People
 
 v.
 
 Beifuss,
 
 22 Cal.App.2d Supp. 755 [67 P.2d 411]).”
 

 “.. . Where a statute contains a reasonably adequate disclosure of the legislative intent regarding an evil to be combatted in language giving fair notice of the practices to be avoided, a court will be slow to say that such a statute is too indefinite to be enforced. The complexities of the social problems dealt with by the Legislature require that a practical construction be given to the language employed by the draftsmen of legislation lest their purposes be too easily nullified by overrefined inquiries into the meanings of words.
 
 ‘Reasonable certainty, in view of the conditions, is all that is required, and liberal effect is always to be given to the legislative intent ivhen possible.’ {People
 
 v.
 
 Kennedy,
 
 21 Cal.App.2d 185, 193 [69 P.2d 224].) The use of words of general meaning is the essence of our code system ...”
 
 {People
 
 v.
 
 Deibert,
 
 117 Cal.App.2d 410, 418 [256 P.2d 355].) [Emphasis supplied.] That is certain which can be made certain by simple reference to the dictionary.
 
 {Cozad
 
 v.
 
 Board of Chiropractic Examiners,
 
 153 Cal.App.2d 249, 257 [314 P.2d 500];
 
 Sultan Turkish Bath
 
 v.
 
 Board Police Comrs.,
 
 169 Cal.App.2d 188 at p. 199 [337 P.2d 203].) The portion of section 11500 of the Health and Safety Code here involved
 
 *253
 
 employs words of long usage, whose certainty is made available by the simple reference to the dictionary and some of which have a well-established common law meaning. Webster, in part, defines an offer as an “act of offering, bringing forward, proposing, or bidding; a presenting for acceptance; a proffer; a proposal, as of marriage; an advance; a bid . . . that which is offered, brought forward, or presented for acceptance; an offering, as in worship.” Now
 
 rare,
 
 “attempt, endeavor, essay; as, he made an offer to catch the ball. . . condition of being offered, as for sale.” (Webster’s New International Dictionary (2d ed.) p. 1690.) Black’s Law Dictionary (4th ed.) defines an offer as “a proposal; a proposal to do a thing. An attempt; endeavor. ’ ’
 

 We think a reading of the statute answers appellant’s argument that it is vague and uncertain. Men of common intelligence do not have to guess at what it means.
 
 (People
 
 v.
 
 Mc-Gaughan,
 
 49 Cal.2d 409 [317 P.2d 974].) There is a reasonably adequate disclosure of the legislative intent regarding the evil to be combated in language giving fair notice of the practice to be avoided.
 
 (Cf. People
 
 v.
 
 Shepard,
 
 169 Cal.App. 2d 283 [337 P.2d 214], upholding the constitutionality of identical language of the first part of section 11502 of the Health and Safety Code which makes it a crime to agree to sell a narcotic and then deliver instead a nonnarcotic substance.)
 

 Appellant’s second major argument on appeal is that the court erred to his prejudice by giving the following instruction to the jury:
 

 “In the case of certain crimes it is necessary that in addition to the intended act which characterizes the offense, the act must be accompanied by a specific or particular intent without which such a crime may not be committed. Thus in the crime of offering to sell narcotics a necessary element is the existence in the mind of the perpetrator of the specific intent to make an offer to sell a narcotic; and unless such intent so exists, that crime is not committed.
 

 “The crime of offering to sell a narcotic consists of two elements, namely, a specific intent to make an offer to sell a narcotic, and a direct act done toward the making of the offer. In determining such an act was done, it is necessary to distinguish between mere preparation on the one hand, and the actual commencement of the doing of the criminal deed on the other. Mere preparation which may consist of planning
 
 *254
 
 the offense or of devising, obtaining, or arranging the means for its commission is not sufficient to constitute this crime; but the act of offering to sell a narcotic would constitute a crime where it clearly indicates a certain unambiguous intent to make an offer to sell a narcotic, and in itself is an immediate step in the present execution of the criminal design.
 

 “The word ‘offer’ is defined in Webster’s Dictionary as meaning: ‘To present for acceptance or reject, to hold out, tender, proffer. ’
 

 “To constitute the offense of offering to sell narcotics, it is not necessary that any particular language or words be used, providing that the language used, viewed in the light of the attending circumstances, is sufficient to show that an offer is being made to sell and furnish narcotics. The offer need not go to the extent of an actual tender or presentation or showing of the narcotics, nor is it necessary that the narcotics offered have a present existence or a definite and ascertained value. ’ ’
 

 Appellant first argues that this instruction violates section 20 of the Penal Code which provides that in every crime there must exist a union of act and intent. We think there can be no question that under the particular circumstances of this case the instruction was proper. The court carefully delineated the difference between the requisite intent, the act required and a mere attempt or incompleted offense.
 

 The gist of appellant’s argument appears to be that in order to be guilty of unlawfully offering to sell narcotics, the offeror must have in his possession the object to be sold. This is not the law.
 

 The particular provision of section 11500 here involved has been construed only in
 
 People
 
 v.
 
 Ford,
 
 81 Cal.App. 449 [253 P. 966], In that case, the defendant was convicted of unlawfully offering to sell narcotics. The drugs were found in the defendant’s place of business about three hours after the offer was made. On appeal from the judgment of conviction, he argued that the trial court erred in denying his motion for a directed verdict because at the time of his arrest, no narcotics were found on his person. In answering this contention, the court said at page 453:
 

 “. . . Reliance for such position by appellant is placed in the case of
 
 People
 
 v.
 
 Herbert,
 
 59 Cal.App. 158 [210 P. 276], In that case the defendant was charged with unlawful possession of morphine. The evidence showed that at the time of his arrest the arresting officer felt the defendant ‘make a motion as if throwing something away, and an object was
 
 *255
 
 heard to drop on the street paving.’ Upon investigation several packages of morphine and cocaine were found from eight to fifteen feet from where the defendant and the officer were standing. The defendant was convicted; and on appeal he urged that the evidence was insufficient to show possession in the defendant of the drugs in question, for the alleged reason that it must have been shown that possession by the defendant was personal and not constructive. The court said that an instruction given by the trial court to the effect that ‘possession must have been an immediate and exclusive possession and one under the dominion and control of the defendant’ fully and correctly stated the law on the subject. However, the judgment was affirmed—which in its effect was an indication that the court' regarded the defendant as having been in the immediate and exclusive possession of narcotics which were not on his person, and which, although from eight to fifteen feet away from him at the time of his arrest, were nevertheless under his dominion and control. Furthermore, that case is distinguishable from the instant case in that- the charge in the case relied upon by appellant was that of possession, while in the instant case the accusation against defendant is that he did unlawfully and feloniously ‘offer to sell.’ The question, therefore, of possession is not necessarily here involved.”
 

 No error appearing in the record before us, the judgment must be affirmed.
 

 Judgment affirmed.
 

 Draper, J., and Good, J. pro tem.,
 
 *
 
 concurred.
 

 *
 

 Assigned by Chairman of Judicial Council.