[Crim. No. 6931.   Second Dist., Div. One.   May 3, 1960.]

THE PEOPLE, Respondent, v. WILLARD ELMO GRAY, Appellant.

Ellery E. Cuff, Public Defender (Los Angeles), Melvin L. Pierovich and Richard W. Erskine, Deputy Public Defenders, for Appellant.

Stanley Mosk, Attorney General, William E. James, Assistant Attorney General, and Marvin Part, Deputy Attorney General, for Respondent.

LILLIE, J.—Defendant was charged with two counts of grand theft alleging the taking of personal property in excess of $200 and a truck and trailer valued at $13,000; and one count of violation of section 503 , Vehicle Code. The court heard the matter without a jury and found defendant guilty on all counts. On appeal he urges the sole issue of lack of substantial evidence to implicate him in the commission of the three offenses.

A truck and trailer owned by Miller and Morrow, loaded with 23 tons of reinforcing steel owned by Rutherford and Skoubye, were stolen and the load sold to Alex Novak and Sons, buyers of scrap metal. Viewed in the light most favorable to the judgment of conviction, the evidence discloses that on September 9, 1957, one Charlie Green "made a deal" to sell the load of steel to Melvin Aberman, buyer and scaleman for Novak and Sons, who had known Green for about three years and previously done business with him. About an hour later, Aberman saw defendant, a truck driver by occupation, drive the truck and trailer with the load into the yard of Novak and Sons; asked his name, defendant told him it was "Campion." At that time Charlie Green and James Alloway, then unknown to Aberman, drove into the yard in an automobile. Aberman weighed the truck and instructed the defendant where to unload it. Defendant drove to the location and later returned the empty truck to the scale where Aberman asked him to sign a weight slip (Ex. 1), which he did, writing the name "Sam Campion" thereon, and gave him a stub. Green, defendant and Aberman then went to the cashier who, at Green's request, gave Green five checks made out to him in various amounts. Green said he wanted it done that way so he could get his share of the load. Later, Alloway cashed one of the checks (Ex. 4) for $250 at a food market, endorsing his name on the back.

Immediately after defendant's arrest, Officer Johnson had a conversation with him consisting of a complete denial "to every interrogation as to the transaction whatsoever;" however later, but in the same conversation, he admitted that Alloway called him on *Sunday* night and asked him if he wanted to go for a ride, which he agreed to do, and they ended up at Green's residence, picked him up and drove to where the truck was parked; that he told Alloway he did not "want any part of it," "didn't want any part of anything out of line"; and that Alloway then drove the truck to Novak and Sons

and he accompanied Green in Alloway's car to the yard. He said he had done time with Alloway and had been closely associated with him but denied driving the truck, getting any money or being connected with the transaction in any way.

Defendant took the stand and testified he was a truck driver and had known Alloway and his wife for some time; that on the *morning of the offense* (Monday) he went to Alloway's home around 7 or 7:30 and the latter asked him if he wanted to ride to Ontario with him where he had to transact some business; that they drove to Charlie Green's and then stopped on a side street behind a junk yard where Alloway got out, started the truck and pulled it into the yard; that Green got out of the car and went into the office; and that although he did get out of the car while in the yard he had nothing to do with the transaction. Defendant described the business done by Aberman with Green and Alloway, and it was then he said he suspected the steel was stolen. Thereafter, Alloway offered defendant $50 to drive the truck over to Riverside, but defendant said he ''did not want anything to do with it.'' After leaving the yard all three stopped several times on the way back to Los Angeles while Green and Alloway cashed some of the checks. Defendant was arrested in February of 1959, at which time he made out a handwriting exemplar card.

Neither Charlie Green nor James Alloway was called to testify.

It is contended that Aberman's testimony—that it was defendant who drove the load into the yard, gave a false name, weighed the load and unloaded the same, signed the weight slip, took a stub from him and went to the cashier for the checks—was so impeached by defendant's testimony and that of the handwriting expert John L. Harris, as to render the evidence ''so incredible that it could not support the judgment.'' Appellant argues that Harris' opinion—that the signature ''Sam Campion'' on the weight slip (Ex. 1) was not in the handwriting of defendant and that the signature of James Alloway on one of the checks (Ex. 4) had closer resemblance to the disputed signature—destroys the probative value of Aberman's identification of him as the person with whom he had the transaction.

As to the single point that the evidence is insufficient to support the verdict ''. . . it is the settled rule that an appellate court 'will decide only whether upon the face of the evidence it can be held that sufficient facts could not have been found by' the trial court to warrant its implied findings,

and before they 'can be set aside . . . it must be made clearly to appear that upon no hypothesis whatever is there sufficient substantial evidence to support the conclusion reached in the court below.' (*People* v. *Newland,* 15 Cal.2d 678, 681 [104 P.2d 778].)'' (*People* v. *Jones,* 36 Cal.2d 373, 375 [224 P.2d 353].) ▆▆▆ Applying this rule, defendant's claim of insufficiency of the evidence cannot be sustained.

The issue here presented primarily involves the weight and value of the evidence, the credibility of the witnesses and a determination of the factual conflict created by the testimony of Aberman and that of defendant and Harris, all exclusively committed to the trial court (*People* v. *Thomas,* 25 Cal.2d 880 [156 P.2d 7] ; *People* v. *Ashley,* 42 Cal.2d 246 [267 P.2d 271]). ▆▆ ▆▆ We are not required to give credence to conflicting testimony; our function is to appraise its effect (*People* v. *Merkouris,* 52 Cal.2d 672 [344 P.2d 1] ; *People* v. *De Paula,* 43 Cal.2d 643 [276 P.2d 600] ; *People* v. *Carnine,* 41 Cal.2d 384 [260 P.2d 16] ; *People* v. *Benford,* 53 Cal.2d 1 [245 P.2d 928]) ; and a reviewing court cannot reject the testimony of a witness that has been believed by the trier of fact unless there exists either a physical impossibility that it is true or its falsity is apparent without resorting to inferences and deductions (*People* v. *Muniz,* 172 Cal.App.2d 688 [342 P.2d 53] ; *People* v. *Roberts,* 47 Cal.2d 374 [303 P.2d 721]).

▆▆▆ The trial judge believed the testimony of Melvin Aberman, the prosecution's witness, which we find to be neither physically impossible of belief nor apparently untrue; and rejected the defendant's version of what occurred. In doing so, he stated ''the story that the defendant tells is highly incredible when viewed in the light of the conduct of an innocent man. . . .'' Relative to the consideration and value the trial court gave to the opinion of John L. Harris, an examination of his testimony will without question explain the little weight accorded to it. ▆▆▆ However, before pointing up the inherent uncertainty and qualified nature of Harris' opinion, we review well defined rules relating to expert testimony—it ''is to be given the weight to which it appears in each case to be justly entitled'' (*State Comp. Ins. Fund* v. *Industrial Acc. Com.,* 195 Cal. 174 [231 P. 996]), and the law makes no distinction between expert testimony and other evidence (*Treadwell* v. *Nickel,* 194 Cal. 234 [228 P. 25]) ; and '' 'when there is a conflict between scientific testimony and testimony as to facts, the jury or trial court must determine the relative weight of the evidence' (*Rolland* v. *Porterfield,*

183 Cal. 466 [191 P. 913].)'' (*Estate of Reed,* 132 Cal.App.2d 732, 735, 736 [282 P.2d 935]). ▮ The rule committing to the trier of fact the determination of the credibility of witnesses and the weight to be given to their testimony applies as well to expert witnesses; it is the judge of the effect and value of opinion evidence (*People* v. *Loop,* 127 Cal.App.2d 786, 800 [274 P.2d 885]). With reference to the testimony of a handwriting expert, the court in *Estate of Reed, supra,* 132 Cal.App.2d 732, said at page 735: ''It is an odd conceit that the trier of the fact must accept indirect evidence given by handwriting experts in preference to the direct evidence of witnesses having personal knowledge upon an issue of identity of a person.''

▮ Harris testified that in his opinion the exemplar of defendant's handwriting and the signature ''Sam Campion'' is not the same handwriting and it would be his ''best judgment that the signature on Exhibit A (*sic*) was written by the person (Alloway) who endorsed the check or Exhibit 4 . . . with the understanding that one or the other had to sign this disputed signature, with the understanding that one of these two persons had to endorse, had to sign this signature, Sam Champion (*sic*), then based on my examination I would say the person who wrote Exhibit 1 did not sign that signature, but the person who endorsed this check—more similarity to his handwriting in this disputed signature than the defendant's handwriting.'' After listening to considerable testimony the trial judge said '' (L)et me see if I understand you. It is your opinion the same person who signed the endorsement, Exhibit 4, is the person whose signature appears on Exhibit 1, is that it?'' and Harris responded: ''Providing one of those two parties signed it. I would have to qualify it on the basis that one of those two persons had to sign the check, had to sign this receipt.'' The judge then told the witness Harris that he still did not understand how he arrived at his opinion and the following colloquy occurred:

''The Witness: The story is this case was presented to me, one of those two persons signed this signature, that there were two persons present on Exhibit 1.

''The Court: The word-signature, Sam Campion?

''The Witness: Yes.

''The Court: You were told it was Defendant A, or B, or Mr. A or Mr. B?

''The Witness: Two persons, I examined their handwriting.''

After considerable discussion the trial judge then said " (I)n other words, this handwriting business is not exact science, is that it?

"The Witness: Well, in some cases it is, and in some cases it isn't. I would be frank to admit that in a case of this kind you have one short signature, that is all the handwriting that is involved, and this signature compared to the defendant's handwriting, there are just dissimilarities that are apparent all the way through; but there are some similarities, if I may point them out. The "C" and formation of the letter "A," small letter "a" and the —— "

Further examination, too long to here relate, discloses the lack of exactness and certainty and the qualified nature of Harris' opinion. The judge finally, near the end of the extensive examination of Harris, stated: "But comparing Exhibit 1 (weight slip) with Exhibit 4 (check) you say there are some likenesses—are you prepared to say it was written by the same person with any degree of certainty?

"The Witness: No, your Honor, I would only say there are more similarities between 4 and 1 than between 1 and A.

"The Court: You couldn't state a professional opinion 4 and 1 were written by the same person?

"The Witness: That is correct, I would not want to do that. . . ."

The conflict relative to identity created by the testimony of Mr. Harris is not such as would render Mr. Aberman's testimony incredible—at most it presented only a factual question for the trial judge, who did not accord the expert's opinion full value because of its conceded uncertainty and qualified nature.

In addition to the lack of exactness in the testimony of Mr. Harris as compared with the positive nature of Mr. Aberman's testimony, other evidence from which reasonable inferences of guilt might be drawn, is found in defendant's statements to the police upon his arrest—first completely denying "every interrogation as to the transaction whatsoever" and then later describing fully what occurred; and defendant's statement on the stand that although the offense occurred in 1957 and he knew a week later the police were looking for him in connection with it, he made no effort to turn himself in and was not arrested until one and one-half years later (1959) when picked up on a warrant; the unexplained absence as defense witnesses of Alloway and Green, whom defendant claimed were solely involved in the commission of the offense; the conceded

difference in the physical appearance between Alloway and defendant as to build, height, etc.; and various discrepancies between defendant's conversation with Johnson as related by the latter, and defendant's testimony in open court. The fact that Aberman's testimony may have been uncertain in some other respects renders his positive identification of defendant neither incredible nor impossible of belief; and the trier of fact may, if he believes the same, accept that portion of his testimony and reject other portions thereof. ■■■ ''The rule as to conflict of evidence applies to cases of inconsistencies and contradictions in the testimony of a witness. The conflict is all the more for the jury for being intestine (Citations)'' (*People* v. *Loop*, 127 Cal.App.2d 786, 800 [274 P.2d 885]).

■■■ Even though uncertainties, contradictions or inconsistencies may appear in the testimony of a single witness, the trial court may still believe the balance thereof to be true (*People* v. *Kennedy*, 21 Cal.App.2d 185 [69 P.2d 224]).

■■■ A careful examination of the entire record before us discloses ample substantial evidence to support the conviction of defendant; it also shows that the trial judge conscientiously, carefully, and at length considered and ''labored this evidence hard'' by analyzing the same and affording the defendant the ''full benefit of the presumptions to which he is entitled,'' after which he finally concluded that the identification of Aberman and numerous unexplained suspicious circumstances and the highly incredible nature of defendant's testimony, viewed in the light of the conduct of an innocent man, established beyond a reasonable doubt that defendant was the man who drove the loaded truck and trailer into the yard of Novak and Sons.

For the foregoing reasons the judgment and the order denying motion for new trial are affirmed.

Wood, P. J., and Fourt, J., concurred.