Filed 6/17/22  In re Tony P. CA2/3

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| In re TONY P., a Person Coming Under the Juvenile Court Law. | B312198 |
| THE PEOPLE, | (Los Angeles County Super. Ct. No. NJ29020) |
| Plaintiff and Respondent, | |
| v. | |
| TONY P., | |
| Defendant and Appellant. | |

APPEAL from an order of the Superior Court of Los Angeles County, John H. Ing, Judge.  Affirmed.

Laini Millar Melnick, under appointment by the Court of Appeal, for Defendant and Appellant.

Rob Bonta, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Susan Sullivan Pithey, Assistant

Attorney General, Noah P. Hill and Stephanie C. Santoro, Deputy Attorneys General, for Plaintiff and Respondent.

———————————

Tony P. appeals from an order sustaining one count of attempted murder in a Welfare and Institutions Code section 602 petition. The primary issue at his adjudication hearing and on appeal was identification; that is, detectives identified Tony from video surveillance of the crime. Tony now contends that the court should have excluded this identification evidence, and further, that it was so inherently improbable as to render the evidence insufficient to support the order sustaining the petition. He also contends that admitting photographic and similar evidence showing him in gang attire and with guns was prejudicial error. We reject all contentions and affirm the order.

## BACKGROUND

I.    The shooting and investigation

At just after 8:00 p.m. on January 5, 2020, Lizet S. was in a car at 21st Street and Locust Avenue when she saw three people, each with a gun, running toward an alley. They wore dark clothing, and one or two of them were shooting guns. Soon thereafter, responding officers found Regina Towns in an open garage off an alley on Locust. Although she had been shot four to five times, she survived.

Two different caliber casings (14 in total) were recovered from the crime scene, suggesting that two guns were used. No DNA or fingerprint testing was conducted on the physical evidence.

Detective Carlos Del Real investigated the shooting. As part of his investigation, he obtained video surveillance from residences near where the crime occurred. The videos show three males, one of whom has a red bandana tied around his face and is wearing long black shorts, long white socks pulled up, and black shoes with white detailing. The other two men's faces are uncovered. The video also shows the car they arrive and leave in. The men go down an alley, fire guns, and run back to their car. Detective Del Real described to the court what he saw in the videos: three people walking in the alley and firing "indiscriminately" in a northeast direction, muzzle flashes, and the people arriving and leaving in a car.

And, as we discuss in greater detail below, Detective Del Real testified that he was familiar with Tony from prior contacts and recognized him as one of the individuals in the video. A second detective, Hector Cardiel, watched the video, and he too recognized Tony, as well as a second individual, Jose S. Detective Cardiel had previously seen Jose S. and Tony together. Also, in the months before the shooting, the detective had seen Tony in a car similar to the one used in the current shooting, an early 1990's or early 2000's model, dark blue or navy Honda Accord with missing hubcaps.

After Tony was identified as a suspect, officers searched his bedroom. A red bandana and Reebok Classic shoes similar to the ones worn by one of the men in the video were recovered, as were Tony's cellphone and a notebook containing handwritten rap lyrics. Officers discovered images on Tony's phone of him wearing a red bandana around his neck and a Raiders shirt and holding a loaded revolver. They also discovered Instagram images of Tony wearing Reebok Classic shoes and a red bandana.

In an Instagram image posted two days before the shooting, Tony is wearing a red bandana and has a revolver tucked in his waistband. According to a gang expert, bandanas, certain styles of Reebok shoes, and wearing shorts with high socks are common gang attire.

Tony's Instagram account referred to just one news article: an article about the shooting of Towns.[1]

II.     The petition and adjudication

The juvenile court sustained one count of attempted willful, deliberate, and premeditated attempted murder (Pen. Code, §§ 664, 187, subd. (a)).[2] The juvenile court ordered Tony committed to the Department of Corrections and Rehabilitation, Division of Juvenile Facilities, and set the maximum term of confinement at life.

## DISCUSSION

I.     Admissibility of detectives' testimony identifying Tony

Tony contends that there was an insufficient foundation for the detectives' testimony identifying him. We disagree.

A. *Additional background*

After the defense objected that Detective Del Real could not give a lay opinion about what the video surveillance showed and that there was an improper foundation for his testimony, the detective testified about his prior contacts with Tony. He said he

---

[1] In his defense, Tony presented, among others, the testimony of a gang expert who discussed gang culture and of an eyewitness identification and memory expert. We discuss their testimony, where relevant, below.

[2] The People dismissed a second count of attempted murder.

4

first encountered Tony in 2011,[3] when the detective arrested Tony's father at the family's house. The detective had a second documented contact with Tony in July 2017, during a probation compliance search. During this second contact, the detective gave Tony his *Miranda*[4] rights and was at the house for an hour. The detective had a third documented contact with Tony when the detective served a search warrant at Tony's house in September 2018. This third contact with Tony lasted about five minutes. To prepare for that third contact, the detective reviewed video surveillance that included Tony.

In addition to these documented contacts, Detective Del Real had, in the about five years before trial, about five to ten undocumented contacts with Tony in the field. When the detective had contact with Tony, Tony was wearing a red bandana. The detective described Tony's clothes as distinctive, in that he does not wear current gang trends and instead wears "the classic" "cholo Sureno style" of baggy pants, loose-fitting T-shirts, long shorts with white socks pulled up, and Nike Cortez or Reebok Classic shoes. The detective also described Tony as having a distinctive facial feature: bushy eyebrows.

The detective added that he first watched the video at the residence where it was taken. After rewatching it several times at his office, he recognized Tony as the car's front passenger. The detective recognized Tony's clothing: the red bandana, shorts and white socks, black Reebok Classic shoes, his lighter complexion, and thin build.

Detective Cardiel testified that he also was familiar with Tony. In 2018, the detective was part of the team that served the

---

[3] In 2011, Tony was nine years old.
[4] *Miranda v. Arizona* (1966) 384 U.S. 436.

search warrant. At that time, the detective arrested Tony and spoke to him for a couple of minutes. Then, in November 2019, Detective Cardiel was involved in a two-months-long surveillance of locations connected to a murder in which it was believed the East Side Longos gang was involved. To prepare for the surveillance, he reviewed photographs of individuals to focus on, including Jose S. Over the course of that two-month surveillance, the detective saw Jose S. about five times, including once at Tony's house. On New Years' Eve 2019, the detective saw Tony in an early 1990's or early 2000's dark blue or navy (almost black) four-door Honda Accord. The car was distinctive due to its bad paint job, dark tinted rear windows, and the absence of driver's side hubcaps. Detective Cardiel saw Tony and Jose S. together again during that surveillance period.

A few days after Towns was shot, Detective Cardiel watched the video surveillance. Before watching it, nobody gave him any information about the suspects he was about to see. He immediately recognized Jose S., and he also recognized Tony. The detective could not identify the third person. The car was similar to the one the detective had seen Tony in during the 2019 surveillance.

B. *The court did not abuse its discretion by admitting identification evidence*

Lay opinion testimony is admissible if it is rationally based on the witness's perception and helpful to a clear understanding of the witness's testimony. (Evid. Code, § 800.) A lay opinion must concern a subject of such common knowledge that people of ordinary education could reach a conclusion as intelligently as the witness. (*People v. Fiore* (2014) 227 Cal.App.4th 1362, 1383.) Where an officer is familiar with the defendant's appearance, the

officer can offer a lay opinion identifying the defendant in surveillance video of a crime.  (*People v. Leon* (2015) 61 Cal.4th 569, 600–601 (*Leon*).)  We review a trial court's admission of such lay opinion testimony for abuse of discretion.  (*Id.* at p. 600.)

In *Leon*, *supra*, 61 Cal.4th at page 600, a detective identified the defendant in surveillance videos.  The detective was familiar with the defendant based on the detective's *post-arrest* contacts with the defendant.  (*Id.* at pp. 600–601.)  That is, the detective was the one who arrested the defendant, saw him nearly 10 times thereafter, and spent about two hours with him.  (*Id.* at p. 600.)  Moreover, the jacket the defendant was wearing when arrested appeared to be the same jacket worn by the suspect in the surveillance videos, and the car in the videos looked like the car the defendant was in when arrested.  (*Id.* at pp. 600–601.)  The Court of Appeal held that the trial court did not abuse its discretion by admitting the evidence.  (*Id.* at p. 601.)

*Leon* cited *People v. Perry* (1976) 60 Cal.App.3d 608, 613, where a police officer reviewed video surveillance of a robbery.  The officer was able to identify the defendant as one of the robbers based on the officer's "numerous" prior contacts with the defendant in the five years before the robbery and based on the defendant's "abnormal-appearing eye."  (*Id.* at p. 610.)  Other people who did not witness the robbery but who knew the defendant (e.g., his apartment manager, the defendant's former employer, and brother) also opined on whether the defendant was the person in the video surveillance, coming to different opinions.  (*Id.* at pp. 611–612.)  In upholding the identifications, the court said the witnesses' opinions were sufficiently based on personal knowledge, and that the degree of knowledge went to the weight rather than the admissibility of the opinions.  (*Id.* at p. 613;

accord, *People v. Mixon* (1982) 129 Cal.App.3d 118, 131–132 (*Mixon*) [officers' identification of defendant from surveillance photographs admissible because officer was familiar with defendant from prior contacts].)

Tony attempts to distinguish this authority by characterizing the detectives' contacts with him as "nowhere near as extensive" as in those cases. He thus states that Detective Del Real had only two brief in-person contacts with him, the one in 2017 and the second in 2019, and he dismisses the 2018 contact as having occurred "in passing" during the execution of a search warrant with numerous officers. Tony similarly dismisses Detective Del Real's field contacts with him and Detective Cardiel's contacts with him during the two-month surveillance.

Although Tony urges us to find that these differences go to admissibility and not to the weight of the evidence, we cannot do so. (See, e.g., *People v. Perry*, *supra*, 60 Cal.App.3d at p. 613; *Mixon*, *supra*, 129 Cal.App.3d at p. 131.) Detective Del Real had seen Tony in a variety of contexts over about eight years. He saw him in the field and at Tony's house. He saw him starting in 2011, when Tony would have been about nine years old, until 2019, when he was 17 years old. That last contact with Tony was just months before the shooting at issue occurred. Throughout that time, Tony had a distinctive way of dressing that generally included a red bandana tied around his neck. Tony's point that others, gang and nongang members alike, shared his style of dress is well-taken. But the ultimate and also valid point is that Tony's style of dress (just like the unique jacket the *Leon* defendant wore) was another fact that, when combined with the detectives' familiarity with him, laid a proper foundation for admitting the identification testimony.

This foundational evidence is similar to that in *Mixon*, *supra*, 129 Cal.App.3d at page 129, where Officer Brown testified that he had seen the defendant on numerous occasions over 10 years during street contacts but could not pinpoint the exact years when he learned of his identity. Officer Brown had never conversed with the defendant but had been within speaking distance of him. (*Ibid.*) And, similar to the way in which Tony's face here was obscured, the *Mixon* robbery suspect wore a ski cap pulled down to his earlobes, and the camera angle was such that his face was visible from only the middle of the nose down. (*Id.* at p. 125.) Here, Detective Del Real had closer contact with Tony, having read him his *Miranda* rights. And Detective Cardiel saw Tony in the course of a surveillance operation, which by its nature, should have required attention to detail.

Tony next argues that the detectives' testimony was inadmissible because it did not help the trier of fact determine identity. (See generally *Mixon*, *supra*, 129 Cal.App.3d at p. 128.) Again, we do not agree. Detective Del Real was able to point out distinctive things about the suspect's clothing in the video, given his familiarity with how Tony was dressed on the prior occasions the detective had seen him. Detective Cardiel also testified that the car used by Towns's assailants looked like the same car the detective had seen Tony in on New Year's Eve 2019, less than one week before Towns was shot. Tony also had been seen with Jose S., whom Detective Cardiel identified as one of the three people in the video.

Finally, Tony argues that the detectives' opinion that he was the person in the video was tantamount to an opinion he committed the offense and, as such, was inadmissible as an opinion on guilt. (See generally *People v. Torres* (1995) 33

9

Cal.App.4th 37, 47 [witness not permitted to express opinion on defendant's guilt or innocence].)  There is a difference between opining on whether a person is guilty and giving evidence tending to show guilt.  Tony's argument fails to appreciate that difference by suggesting that any evidence linking a defendant to a crime is inadmissible because it supports guilt.  That is not the law.

II.     Sufficiency of the evidence to support attempted murder

Relying on the supposed inherent improbability of the evidence identifying him, Tony contends that the evidence was insufficient to sustain the allegations of attempted murder.

A challenge to the sufficiency of the evidence requires us to review the entire record in the light most favorable to the judgment to determine whether it contains evidence that is reasonable, credible, and of solid value such that a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt.  (*People v. Bolin* (1998) 18 Cal.4th 297, 331.)  We do not resolve credibility issues or evidentiary conflicts; such are the exclusive province of the trier of fact.  (*People v. Young* (2005) 34 Cal.4th 1149, 1181.)  Unless testimony is physically impossible or inherently improbable, a single witness's testimony is sufficient to support a conviction.  (*Ibid.*)  Although we will not uphold a judgment or verdict based upon inherently improbable evidence, testimony that merely discloses unusual circumstances does not come within that category.  (*People v. Dalton* (2019) 7 Cal.5th 166, 209.)  For us to reject a witness's statement that a trial court has believed, it must be physically impossible that the statement is true, or its falsity must be apparent without resort to inferences or deductions.  (*Ibid.*)

As Tony points out, no DNA or fingerprint tests were conducted on the bullet casings; the guns were never recovered;

10

Towns apparently gave no statement to the police; Lizet S. could not describe Towns's assailants, except to say there were three of them wearing dark clothing and carrying guns; and the motive for the crime was unclear, although there was a slight suggestion it was gang-related. Identification was therefore the key issue.

As to that, Tony draws on the testimony of his eyewitness and memory expert to argue that the detectives' identifications were inherently improbable or unreliable. The expert testified that the main factors influencing an identification's accuracy and reliability are (1) the quality of the video, (2) the person's familiarity with the individual in the video, and (3) the time that lapsed between when the person last saw the individual and when they had to make the identification.

First, the expert testified that the video surveillance was of low quality because the individual's face was partially obscured. Hence, Tony argues that the identifications were not based on recognizing his face or individual characteristics but merely on his not uncommon style of gang dress. However, Detective Del Real based his identification not just on what he described as Tony's distinct way of dressing but also on his lighter complexion and thin build. While these may not be distinctive or unusual characteristics, it is not necessary that a person's characteristics be unique to make a person identifiable. While a person may be more readily identifiable if they have a facial abnormality (see, e.g., *People v. Perry*, *supra*, 60 Cal.App.3d at p. 610 [defendant had abnormal eye]), having "normal" features does not make them inherently unidentifiable. And while Tony's distinct way of dressing, which included a red bandana and a certain style of

11

shoes, was certainly shared by others,[5] it nonetheless was Tony's style and, as such, was another factor that helped the detectives recognize him in the video.[6]

Second, Tony discounts the detectives' testimony that they were familiar with him. We have already addressed this issue, noting that even though the detectives could not see Tony's entire face, they were both familiar with him. Detective Cardiel had, within months of the shooting, seen him at least twice before. Detective Del Real had seen him three times in person (one time being when the detective arrested Tony), and an additional five to ten times in the field.

Finally, Tony argues that human memory is limited. He thus refers to the expert's testimony that, for example, repeated viewing of a suspect can lead to overconfidence in an identification and that if a witness's memory of a face is weak, the witness will tend to use clothing cues to make an identification. The court, however, heard that evidence, evaluated it in the context of this specific case, and was entitled to give it whatever weight it believed appropriate. (See generally *People v. Gray* (1960) 180 Cal.App.2d 594, 598–599 [trier of fact determines credibility of expert witnesses and weight to be given their testimony].)

Otherwise, the identifications, notably, were not uncorroborated. (See generally *People v. Scott* (1978) 21 Cal.3d

---

[5] The People's witness testified that a number of gangs associate with the color red, and the defense gang expert said that at least four different Latino gangs use the color red.

[6] At a preadjudication hearing under *In re Dennis H.* (1971) 19 Cal.App.3d 350 regarding detention, Detective Del Real said he also recognized Tony's "body language," meaning the way he walked, his gait.

284, 296 [*uncorroborated* testimony of single witness is sufficient to sustain a conviction unless testimony is physically impossible or inherently improbable].) *Two* detectives identified Tony. Detective Del Real first identified him from the video. Then, without being given any information about who he might see in the surveillance video, Detective Cardiel independently identified Tony. He also identified Jose S., who had been seen with Tony in the months before Towns was shot. Other evidence connected Tony to the crime. Just one week before Towns was shot, Tony was seen in an older model, dark-colored Honda Accord with missing hubcaps similar to the one the suspects used in the shooting. Also, on his Instagram account, Tony referred to just one news article, one about the shooting. While this evidence might be circumstantial, it nonetheless supported the adjudication order.

We therefore cannot find, under the standard of review and given the combination of factors that led the detectives to identify Tony, that the identifications were inherently improbable so as to render the evidence insufficient to support the adjudication.

III. Admission of evidence

Next, Tony contends that the court improperly admitted, over the defense objection, the photographs, video, and social media posts extracted from his cell phone showing him in gang attire and with guns.

Only relevant evidence is admissible. (Evid. Code, § 350.) "Relevant evidence" includes evidence relevant to a witness's or hearsay declarant's credibility, having any tendency in reason to prove or disprove any disputed fact that is of consequence to determining the action. (*Id.*, § 210.) Evidence may be relevant if it tends logically, naturally and by reasonable inference to

13

establish material facts such as identity, intent, or motive. (*People v. Hamilton* (2009) 45 Cal.4th 863, 913.) But even relevant evidence may be excluded if its probative value is outweighed by the risk of undue delay, undue prejudice, or confusion. (Evid. Code, § 352; *Hamilton*, at p. 914.) We review a trial court's decision to admit or exclude evidence for abuse of discretion. (*People v. Jackson* (2016) 1 Cal.5th 269, 330.)

Here, the court found that the challenged evidence was relevant to establish identity. Some of the photographs showed Tony wearing a red bandana and Reebok Classic shoes, both of which were worn by one of the three people in the video surveillance. There were also photographs of Tony with Jose S., who was identified as one of the individuals involved in the shooting. As we have said, Detective Del Real had seen Tony on multiple occasions in such attire and this was one of the reasons he recognized Tony. These photographs therefore corroborated the detective's testimony that Tony dressed in this manner.

We find more persuasive Tony's assertion that the court erred in admitting other evidence, including images of Tony in a Raiders shirt and holding a loaded revolver, a video in which Tony can be heard making disparaging comments about rival Crips gangs, and his rap lyrics. The probative value of this evidence was questionable. As to images of Tony with a gun, officers never recovered the guns used in this case, and there was no evidence that the gun Tony had in the video was used to shoot Towns. "When the prosecution relies on evidence regarding a specific type of weapon, it is error to admit evidence that other weapons were found in the defendant's possession, for such evidence tends to show not that he committed the crime, but only that he is the sort of person who carries deadly weapons." (*People*

*v. Barnwell* (2007) 41 Cal.4th 1038, 1056.)  Therefore, the evidence simply suggested that Tony was the sort of person who carries deadly weapons.

As for the disparaging remarks about Crips in the video and rap lyrics, there was no evidence that Towns was a Crips gang member, mistaken for one, or was even a gang member. There was no gang allegation, and it was unclear whether the crime was gang-related.  While rap lyrics can, in some circumstances, constitute circumstantial evidence of intent or motive (see, e.g., *People v. Johnson* (2019) 32 Cal.App.5th 26, 60–61; *People v. Zepeda* (2008) 167 Cal.App.4th 25, 35), here there was no connection between the lyrics and the charges.  We are therefore doubtful about the relevance of the rap lyrics.

However, even if some of this evidence should have been excluded, we cannot find that any error in admitting it was prejudicial.  (See generally *People v. Partida* (2005) 37 Cal.4th 428, 439 [absent issue of fundamental fairness, state law error in admitting evidence is subject to *People v. Watson* (1956) 46 Cal.2d 818, 836 test].)  As we have said, photographs depicting Tony wearing clothes similar to those worn by one of the possible shooters were relevant to identity.  And while there was no gang allegation at issue, that Tony was a gang member was hardly a revelation.  It therefore is not reasonably probable the outcome would have been more favorable to Tony absent the admission of some of the photographs and rap lyrics, especially where, as here, the court, rather than a jury, sat as the trier of fact.  (See, e.g., *People v. Walkkein* (1993) 14 Cal.App.4th 1401, 1408 [professional jurist can weigh admissible evidence without being prejudiced by extraneous matters]; *In re Hernandez* (1966) 64 Cal.2d 850, 851 [judge could weigh evidence without being

15

prejudiced by prior felony conviction]; *People v. Lashley* (1991) 1 Cal.App.4th 938, 952 [same as to inflammatory argument].)

## DISPOSITION

The order adjudging Tony P. a ward of the court and sustaining the petition is affirmed.

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

EDMON, P. J.

We concur:

LAVIN, J.

KALRA, J.*

---

\* Judge of the Los Angeles County Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.